**NEWMONT MINING CORPORATION,**
**Plaintiff-Appellant,**

v.

**T. Boone PICKENS, Jr., et al.,**
**Defendants-Appellees.**

**No. 87-2712.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 9, 1987.

Decided Nov. 6, 1987.

Paul Vizcarrondo, Jr., New York City, for plaintiff-appellant.

Philip J. John, Houston, Tex., for defendants-appellees.

Lucinda O. McConathy, Washington, D.C., as amicus curiae.

Before SCHROEDER, PREGERSON, and NELSON, Circuit Judges.

SCHROEDER, Circuit Judge.

Appellant Newmont Mining Corporation ("Newmont") appeals the district court's denial of Newmont's request for a preliminary injunction. Newmont sought to enjoin a tender offer commenced by Ivanhoe Acquisition Corporation on behalf of numerous individuals and entities including T. Boone Pickens ("the Pickens Group"). In view of the significance of the issue presented and the exigencies of time involved in takeover bids, we entered a stay pending appeal, ordered the appeal expedited, and requested amicus briefing by the Securities and Exchange Commission (SEC). We affirm the district court's denial of injunctive relief.

The injunction action arose out of what the district court described as a "celebrated takeover battle for corporate control." The Pickens Group commenced the tender offer for twenty-eight million shares of Newmont common stock on September 8, 1987. In accordance with SEC regulations, the Pickens Group filed a disclosure state-

ment with the SEC, which reflected that the Pickens Group did not yet have firm commitments for the total amount of the funds necessary to consummate the offer. Newmont's incumbent management filed a complaint against Pickens two days later alleging violations of the securities laws, and moved for a preliminary injunction on September 14, 1987 to prevent the tender offer from going forward. The district court denied the motion by order dated September 15, 1987, from which this appeal is taken pursuant to 28 U.S.C. § 1292.

■ In reviewing a denial of preliminary injunctive relief, this court should reverse only if the district court abused its discretion, or based its decision on an erroneous legal standard or on clearly erroneous findings of fact. *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1381 (9th Cir. 1987). Here the facts are not in dispute, and Newmont contends only that the district court erroneously interpreted the requirements of the federal securities acts pertaining to takeovers, incorporated in what is commonly known as the Williams Act. 15 U.S.C. §§ 78m(d), (e), 78n(d), (e), (f). The dispositive issue is an issue of law, which we review de novo. *Colorado River Indian Tribes v. Town of Parker*, 776 F.2d 846, 848 (9th Cir.1985). That issue is whether the disclosure requirements of the Williams Act mean that the tender offeror must have the terms of its financing arrangements settled at the time that the tender offer commences.

The Williams Act was enacted in 1968. It requires that a party making a tender offer who would acquire more than five percent of a company's outstanding shares file a statement with the Securities and Exchange Commission prior to commencement of the tender offer, setting forth certain information to enable shareholders to make informed decisions about whether to tender their stock, to sell on the open market, or to retain their interest in the company. The statement must disclose:

the source and amount of the funds or other consideration used or to be used in making the purchases, and if any part of the purchase price is represented or is to

be represented by funds or other consideration borrowed or otherwise obtained for the purpose of acquiring, holding, or trading such security, a description of the transaction and the names of the parties thereto....

15 U.S.C. § 78m(d)(1)(B). The Williams Act authorized the SEC to implement its provisions, 15 U.S.C. § 78n(d)(1), and the SEC's current regulations are set forth in 17 C.F.R. §§ 240.13d, 240.13e, 240.14d, 240.14e, and 240.14f. The form of the tender offer statement that bidders must complete is set out in Schedule 14D–1. 17 C.F.R. § 240.14d–100.

The SEC's Schedule 14D–1 requires that the offeror "state the source and the total amount of funds or other consideration for the purchase of the maximum number of securities for which the tender offer is being made." 17 C.F.R. § 240.14d–100, Item 4. For borrowed funds, the form further requires the offeror to provide a summary of each loan containing "the identity of the parties, the term, the collateral, ... and other material terms or conditions" and to describe any plans to finance or repay such borrowings. *Id.*

Here, the Ivanhoe Acquisition Corporation tender offer was for twenty-eight million shares at $95 per share, later amended to $105 per share, contemplating an overall transaction of approximately $3.3 billion. The Pickens Group disclosed that the $3 billion would be provided through (1) $600 million in cash equity contributions from Ivanhoe stockholders, (2) $1.5 billion borrowed pursuant to a margin credit facility to be arranged by Wells Fargo Bank, N.A., and (3) the sale of $1.1 billion of increasing rate notes to be arranged by Drexel Burnham Lambert Company. Drexel has provided the Pickens Group with a letter declaring it is "highly confident" it can arrange that level of financing. At issue in this appeal is only the adequacy of the Drexel "highly confident" letter.

The overall description of financing in the offer provides in pertinent part, at section 9:

Source and Amount of Funds. The total amount of funds required by the

Purchaser and Holdings to purchase 28,-000,000 Shares pursuant to the Offer, to repay previously incurred margin debt and to pay related fees and expenses is estimated to be approximately $3,000 million. Pursuant to the Offer Agreement, Ivanhoe Partners II will contribute $600 million of such funds to Holdings. Ivanhoe Partners II will receive such $600 million from the Partners in the form of capital contributions as described herein. The Offer Agreement also provides that upon completion of the Offer, Ivanhoe Partners will contribute the Shares it presently owns to Holdings, subject to approximately $227 million of previously incurred margin debt and certain accrued expenses. Holdings expects to obtain the balance of the funds needed to purchase Shares and pay related fees and expenses from (i) borrowings of $1,500 million pursuant to an up to $2,000 million margin credit facility expected to be arranged by Wells Fargo Bank, N.A. ("Wells Fargo") and (ii) the sale of $1,100 million of increasing rate notes of Holdings (the "Increasing Rate Notes") expected to be arranged by Drexel. A portion of the proceeds of such borrowings will be used to repay the previously incurred margin debt and expenses.

With respect to the Drexel transaction, section 17 of the tender offer provides in pertinent part:

Ivanhoe Partners and the Purchaser have entered into separate engagement letters (the "Drexel Letter Agreements") with Drexel and Drexel Burnham Lambert Company B L.P. (which are collectively referred to in this Section 17 as "Drexel") pursuant to which Drexel is acting as financial advisor to Ivanhoe Partners and the Purchaser in connection with the transactions described in this Offer to Purchase and as Dealer Manager for the Offer. Drexel has also entered into a dealer manager agreement in connection with the Offer. Ivanhoe Partners will pay Drexel a $500,000 engagement and financing retainer, and the Purchaser will pay Drexel a fee of $1 million (against which the $500,000 retainer fee will be credited) for acting as

Dealer Manager in connection with the Offer. The Purchaser will also pay Drexel a fee of $1.5 million in connection with the delivery of Drexel's letter stating that it is highly confident that it can arrange $1.1 billion of financing in connection with the Offer.

The appellants assert that the disclosure of the Drexel "highly confident" letter and the terms under which it was delivered is insufficient to satisfy the requirements of the Williams Act. They argue that the offer cannot commence until the financing is actually arranged and the terms of, and parties to, the notes are disclosed. The appellees, on the other hand, contend that they have disclosed all available information and no more is required before commencement of the tender offer, due to existing regulations providing for amendments to, and extensions of, tender offers.

■ The text of the Williams Act is silent as to when financing arrangements must be made in relation to the disclosure requirements. Nothing in the history of the statute or the regulations indicates that all information must be provided at the outset of the offer. We do know that the purpose of the Act is to require disclosure to permit shareholders to make an informed decision, and that the statute was not intended to impose substantive restrictions on the actual terms of tender offers. S.Rep. No. 550, 90th Cong., 1st Sess. 1 (1967). The Supreme Court has observed:

The purpose of the Williams Act is to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information regarding the qualifications and intentions of the offering party.... By requiring disclosure of information to the target corporation as well as the Securities and Exchange Commission, Congress intended to do no more than give incumbent management an opportunity to express and explain its position. The Congress expressly disclaimed an intention to provide a weapon for management to discourage takeover bids or prevent large accumulations of stock which would cre-

ate the potential for such attempts. Indeed, the Act's draftsmen commented upon the "extreme care" which was taken "to avoid tipping the balance of regulation either in favor of management or in favor of the person making the takeover bid."

*Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58–59, 95 S.Ct. 2069, 2075–76, 45 L.Ed.2d 12 (1975).

Congress gave wide latitude to the SEC in deciding what disclosures are necessary. 15 U.S.C. § 78n(d)(1) authorizes "such additional information as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors." The history of the regulations themselves over the last twenty years reflect the degree of latitude given. When the current regulations were adopted in 1977, commentators had objected to disclosure of interest rates on loans obtained for the tender offer, arguing such disclosure was unnecessary. Despite these objections, and despite no specific provision in the Williams Act requiring such disclosure, the SEC nevertheless decided to require this information. Securities Act Release No. 5844, [1977–78 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 81,256 (July 21, 1977). This indicates that specific disclosure requirements are not within the mandate of the Williams Act, but instead are within the SEC's discretion.

The appellant, in arguing that the statute itself requires full and prior disclosure of all terms and parties in a tender offer, relies heavily upon an exchange between Senator Williams and the General Counsel for the SEC, Phillip Loomis, during 1967 Senate hearings on the Williams Act. This discussion concerned a proposal requiring a bidder to file its tender offer statement with the SEC five days before commencing its offer, a proposal Congress did not adopt.

Mr. LOOMIS: [A] man would file his papers while he was getting ready to make his tender offer, deciding whether he was going to do it, arranging his financing, deciding on what the price is going to be, and it would not delay the making of an offer when the man was ready to make it. So I think the exchanges' point on their assumptions was a very reasonable one, but it just would not work that way.

Senator WILLIAMS: Wait a minute. You are saying that during the 5–day period he can go ahead and make his financing arrangements. Are not the financing arrangements one of the requirements of disclosure?

Mr. LOOMIS: Yes.

Senator WILLIAMS: So that must all be accomplished first.

Mr. LOOMIS: He might have to supplement it, or he might not. If he said it was going to be bank loans, he could say that earlier while making his deal with the bank.

*Full Disclosure of Corporate Equity Ownership and in Corporate Takeover Bids: Hearings on S. 510 Before the Subcomm. on Securities of the Senate Comm. on Banking and Currency*, 90th Cong., 1st Sess. 191 (1967). Appellant argues that this exchange shows the intent of Senator Williams, as sponsor of the Williams Act, to require that firm financing be in place before a tender offer can commence. However, it is not possible to draw that conclusion from this passage. Such a brief exchange, about a proposal never adopted, does not support the interpretation of the Williams Act that appellant proposes, especially when the general counsel for the SEC's final reply appears to suggest that an offer could commence with contingent financing. The SEC has consistently permitted amendments to tender offers and has never regarded the original tender offer statement as final. 17 C.F.R. § 240.-13d–2 (1975); 17 C.F.R. § 240.14d–6(d)(1987).

This is the only mention of firm financing in the legislative history of the original Williams Act, and the position then taken by SEC General Counsel Loomis is fully consistent with the position that the SEC takes in this lawsuit.

The SEC made a passing reference to the subject in 1970, two years after the Williams Act was enacted. Congress then

amended section 14(e), which deals with fraudulent or deceptive practices and is a separate provision from the disclosure requirements of section 14(d). The purpose of the section 14(e) amendment was to provide the SEC with rulemaking powers to "prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative." 15 U.S.C. § 78n(e). During hearings on this proposed amendment, Hamer Budge, SEC Chairman, was asked for "examples of the fraudulent, deceptive, or manipulative practices used in tender offers which the proposed Commission rulemaking powers would prevent." *Additional Consumer Protection in Corporate Takeovers and Increasing the Securities Act Exemptions for Small Businessmen: Hearings on S. 336 and S. 3431 Before the Subcomm. on Securities of the Senate Comm. on Banking and Currency*, 91st Cong., 2d Sess. 11 (1970). The SEC introduced a memorandum prepared by the Division of Corporation Finance, which noted that one problem area not dealt with by existing law was that "[t]he person who makes a tender offer may not have in hand the funds to pay for the securities he offers to purchase ... or a legally enforceable commitment to borrow such funds from [a] responsible person." [1] *Id.* at 12. Although the amendment expanding the rulemaking authority under 14(e) was enacted, the SEC has never promulgated a regulation dealing with this problem.

In this litigation, the SEC has appeared in support of the position of the appellees, arguing persuasively that while the disclosure of all material terms of financing is required at some time, it is not necessary that all the terms of financing be in place at the time the offer commences. The SEC points to the system of regulations in place since the adoption of the Williams Act twenty years ago requiring amendments to tender offers and authorizing extensions of time to permit shareholder review.

The Williams Act itself, as well as the SEC regulations, contemplate that changes will occur in tender offer statements. The statute requires amended disclosures when material changes occur.

> If any material change occurs in the facts set forth in the statements to the issuer and the exchange, and in the statement filed with the Commission, an amendment shall be transmitted to the issuer and the exchange and shall be filed with the Commission, in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78m(d)(2). Similarly, the SEC requires the disclosure and dissemination of material changes. "A material change in the information published or sent or given to security holders shall be promptly disclosed to security holders in additional tender offer materials." 17 C.F.R. § 240.-14d–6(d); *see also* 17 C.F.R. § 240.13e–4(d)(2). In keeping with the Williams Act's purpose of providing adequate information to shareholders, the SEC requires prompt dissemination of any material changes.

> If a tender offer has been published or sent or given to security holders by one or more of the methods enumerated in paragraph (a) of this section, a material change in the information published or sent or given to security holders shall be promptly disseminated to security holders in a manner reasonably designed to inform security holders of such change....

17 C.F.R. 240.14d–4(c); *see also* 17 C.F.R. § 240.13e–4(e)(2). Further, to ensure that shareholders are given sufficient time to consider the amended terms of the offer, the offer will be extended if necessary. Sec. Exch. Act Rel. No. 24296 (April 3, 1987), 38 SEC Dkt. 32 (April 21, 1987), 52 Fed.Reg. 11458 (April 9, 1987). In fact, in its amicus curiae brief before this court, the SEC stated, "Thus, if the new information is disclosed at or near the end of the period when the tender offer was originally set to expire, the offer must be extended for an additional period of time to allow the information to be considered." Amicus Curiae Brief, p. 17. Tendering shareholders

---

**1.** It is this passage upon which the dissent inappropriately relies.

may withdraw their securities so long as the offer remains open. 17 C.F.R. § 240.-14d–7(a). The SEC also points to the fact that if the shareholders accept the tender offer, the offeror must pay within a prompt period of time. 17 C.F.R. § 240.14e–1(c).

■ Thus, Congress and the SEC have recognized that material changes may occur in tender offer statements. Such changes do not mean that the tender offer was improperly commenced, but merely necessitate further disclosures to the shareholders. *See* Sec. Exch. Act Rel. No. 24296 (April 3, 1987), 38 SEC Dkt. 32 (April 21, 1987), 52 Fed.Reg. 11458 (April 9, 1987). We conclude that under the present regulatory system, firm financing need not be in place at the time a tender offer commences.

The SEC may decide to require more rigid initial disclosures and it may decide in the future to require that all parties and terms of all loan transactions be disclosed when the initial tender offer statement is filed. However, the SEC recently considered requiring that firm financing be in place before commencing a tender offer, and decided against instituting such a requirement. At present, Congress is considering whether to amend the statute to require firm financing before the tender offer may go forward. The Sanford and Dingell–Markey bills, S.1324 and H.R. 2172, propose that financing be finalized before commencing a tender offer. A report by the Congressional Research Service summarizes the nature of the debate as follows:

Felix Rohatyn and Martin Lipton have proposed that firm financing be in place before a tender offer may be filed and Section 11 of S. 1324 (Sanford) fashions legislation to this effect....

On the other side of the issue, the Securities and Exchange Commission considered this matter at a meeting of the Commission on January 9, 1986. In a January 17, 1986 letter to then-Representative Timothy Wirth, Chairman, House Subcommittee on Telecommunications, Consumer Protection and Finance, SEC Chairman John Shad recounted the various positions on takeovers voted upon by the Commission. These included a statement on "firm financing:"

The Commission also considered a variety of offensive and defensive takeover tactics and issues, and unanimously concluded that the marketplace, and state and federal courts are adequately addressing these issues. The Commission therefore determined not to take or recommend actions that would:

... require that bidders have "firm" financing commitments prior to commencing tender offers. (The Commission noted, among other things, the multiple conditions to "firm" financing commitments, as well as the other terms of tender offers, and determined to continue to rely on full disclosure of such terms and conditions)....

Brancato, *Takeover Bids and Highly Confident Letters*, Congressional Research Service, The Library of Congress 20–21 (Aug. 28, 1987).

Implicit in the very fact of the Congressional and administrative debate is the assumption that if firm financing is to be a prerequisite to tender offers, either a legislative or administrative policy decision is required. Thus, judicial interpretation alone will not suffice.

Our decision is in accord with the only known decisions of other courts dealing with this issue. *Plaza Securities Co. v. Fruehauf Corp.*, 643 F.Supp. 1535 (E.D. Mich.1986); *Warnaco, Inc. v. Galef*, Civ. No. B–86–146 (PCD) (D.Conn. April 3, 1986), *aff'd mem.*, 800 F.2d 1129 (2d Cir.1986).

AFFIRMED.

PREGERSON, Circuit Judge, dissenting.

I dissent. The Williams Act expressly requires that an offeror disclose, at the outset of the tender offer, its "source of funds" and if the funds are to be borrowed "a description of the transaction and the names of the parties thereto." 15 U.S.C. § 78m(d)(1)(B) (1981). The Williams Act further authorizes the Securities and Exchange Commission to implement the Act's

provisions, 15 U.S.C. § 78n(d)(1), and the SEC has promulgated regulations setting forth the information to be contained in the tender offer statement that must be completed and filed with the SEC at the outset of an offer. 17 C.F.R. § 240.14d–100 (1987). This statement is known as Schedule 14D–1.

To insure compliance with the statute, Schedule 14D–1 requires the disclosure of specific information for the benefit of the target company's shareholders. For example, Item 4 of Schedule 14D–1 requires disclosure of "the source and the total amount of funds or other consideration for the purchase of the maximum number of securities for which the tender offer is being made." For borrowed funds, Item 4 of Schedule 14D–1 further requires a summary of each loan, including "the identity of the parties, the term [of the loan], the collateral, the stated and effective interest rates, and other material terms and conditions."

The Pickens Group's offer in this case plainly does not comply with the straightforward requirements of the statute and the implementing regulations. The Pickens Group's offer discloses that a portion of the funds to purchase Newmont shares will be derived from the sale of increasing rate notes to be arranged by Drexel Burnham Lambert Company, and that Drexel is "highly confident" it can raise the necessary funds. The increasing rate notes will be issued by Ivanhoe Partners Holdings, Inc. Ivanhoe Partners is the corporate parent of Ivanhoe Acquisition Corporation, the entity formally making the tender offer. Drexel makes no commitment to supply any funds; it is not a lender or underwriter. Drexel is merely acting as a broker in this transaction. As to the Drexel financing transaction, the tender offer does not set forth the identity of the notes' purchasers, the terms of the notes, the collateral to be used to secure the notes, or the interest rates. This portion of the offer, as it relates to borrowed funds, therefore does not comply with Item 4 of Schedule 14D–1.

Full and fair disclosure of the information required on Schedule 14D–1 is not a mere technicality, but lies at the very heart of the Williams Act. Congress passed the Williams Act to insure that public shareholders "will not be required to respond [to a tender offer] without adequate information regarding the qualifications and intentions of the offering party." *Rondeau v. Mosinee Paper Co.,* 422 U.S. 49, 58, 95 S.Ct. 2069, 2076, 45 L.Ed.2d 12 (1975); *SEC v. Carter Hawley Hale Stores, Inc.,* 760 F.2d 945, 948 (9th Cir.1985) ("The Williams Act was intended to ensure that investors responding to tender offers received full and fair disclosure...."). Disclosure of the identity of all lenders, the material terms of all loans, the nature of the collateral to be used to secure the loans, and the interest rates is information that Newmont shareholders should have before deciding whether to tender their shares. This information might tell the shareholders something about the qualifications and intentions of the offeror and could bear on the probable value of Newmont stock should the offeror succeed in gaining control of the company. Such full disclosure is particularly important where, as here, the offer is for less than all of the outstanding shares of a company and therefore some of the shareholders will retain their holdings under the new management.

Without adequately considering the language of Item 4 of Schedule 14D–1, the majority adopts the SEC's contention, set forth in its amicus brief, that "firm financing" need not be in place at the outset of a tender offer. While certainty as to every detail of the tender offer's financing is not required when the offer is first made, it is hard to understand how the SEC can ignore the plain language of its own regulation, which clearly requires that an offeror disclose, for borrowed funds, the identity of the parties, the terms of the borrowing, the collateral to be used, and the interest rates. 17 C.F.R. § 240.14d–100 (1987).

In supporting the Pickens Group here, the SEC overlooks a view of the Williams Act that it acknowledged in promulgating Schedule 14D–1, after engaging in appropriate rulemaking procedures. For example, in announcing the final rule adopting Schedule 14D–1, the SEC explained that,

although commentators had criticized the proposed requirement that the offeror disclose the effective interest rate on loans used to finance a tender offer, the SEC was not persuaded, and the requirement to disclose the interest rate would remain. 42 Fed.Reg. 38,341, 38,345 (July 28, 1977). The SEC emphasized that the offeror must disclose the effective interest rate for each loan, not just the combined interest rate for all loans. *Id.* In this case, the Pickens group has not disclosed the interest rate applicable to the Drexel financing transaction, yet the SEC now indicates that disclosure of such information at the commencement of the offer is not necessary.

The SEC's earlier goal of enforcing full disclosure of all of the material terms of all loans in a tender offer is further clarified by an exchange between Hamer Budge, then SEC Chairman, and Senator Williams during the 1970 hearings on an amendment to section 14(e) of the Williams Act. At the hearings, the SEC presented a memorandum which suggests that it would be a "fraudulent, deceptive, or manipulative" practice under the Williams Act for a party to make a tender offer without having "in hand the funds to pay for the securities he offers to purchase ... or a legally enforceable commitment to borrow such funds from [a] responsible person."[1] *Additional Consumer Protection in Corporate Takeovers and Increasing the Securities Act Exemptions for Small Businessmen: Hearings on S. 336 and S. 3431 Before the Subcomm. on Securities of the Senate Comm. on Banking and Currency,* 91st Cong., 2d Sess. 12 (1970).

This court ordinarily defers to an enforcement agency's interpretation of a statute and its implementing regulations. However, in light of the SEC's inconsistent interpretation of the plain language of its regulations and of the requirements of the Williams Act, such deference is inappropriate. *McCoog v. Hegstrom,* 690 F.2d 1280, 1284 (9th Cir.1982). In short, the SEC's own regulations, as implemented by Item 4

of Schedule 14D–1, require the disclosures requested by Newmont in this case.

The SEC and the majority also assert that the existence of an amendment procedure for tender offers implies that full disclosure is not required when the tender offer is first made. 15 U.S.C. § 78m(d)(2) (1981), 17 C.F.R. § 240.14d–6(d) (1987). This argument is unpersuasive. The fact that material changes that occur during the course of a tender offer must be disclosed (and the expiration date of the offer extended) does not excuse an offeror from complying with the Williams Act at the outset of the tender offer.

Moreover, the facts of this case demonstrate that the existence of an amendment procedure will not necessarily cure any initial failure to comply with the requirements of the Williams Act. Although tendering shareholders may withdraw their shares as long as the offer remains open, 17 C.F.R. § 240.14d–7(a), it is still possible for the offer in the instant matter to expire without the Pickens Group having disclosed all the terms of the Drexel financing.

Under Section 3 of the Pickens offer, shares may be withdrawn until the expiration date of the offer. The SEC argues that firm financing information "almost certainly" would have to be in place by the expiration date because of its requirement that the purchaser make payment for shares promptly thereafter. 17 C.F.R. § 240.14e–1(c) (1987). Section 14 of the Pickens offer states, however, that the purchaser "expressly reserves the right ... to delay payment for any Shares, regardless of whether such Shares were theretofore accepted for payment, upon the occurrence of the conditions specified in Section 15." These conditions include the event that "the Purchaser shall not have obtained sufficient financing to enable it to purchase 28,000,000 shares and to pay related costs and expenses." Thus, there may be a significant delay between the time the offer closes and the time payment is made for

---

1. The majority incorrectly states that the SEC promulgated no rule to prohibit this conduct. To the contrary, in 1977, the SEC adopted Schedule 14D–1 to "implement the intent of

Congress in enacting sections 14(d) and 14(e) of the Exchange Act." 42 Fed.Reg. 38,341, 38,342 (July 28, 1977).

the tendered shares. As a result, the final financing arrangements could conceivably be made after the time has passed when shareholders are permitted to withdraw their shares. This could allow the Pickens Group to circumvent any meaningful disclosure of information concerning the lenders (i.e., purchasers of the Drexel notes), the final terms of the notes, and the collateral to be used to secure the notes.

Neither the SEC nor the Pickens Group has presented any authority that would preclude this result. The SEC, in its amicus brief, fails to address the question of what happens when the details of the financing are available only after the expiration date of the offer. The SEC's brief *assumes* that the offer will not close without firm financing being disclosed and argues on the basis of an interpretative release, 52 Fed.Reg. 11458 (April 9, 1987), that the offer will have to be amended and extended to allow shareholders to consider the new information. Yet the SEC points to no statutory or regulatory basis to support this position.

Indeed, in the case before us, although the offer was originally scheduled to expire on October 5, 1987, as of this date the offer has not been amended to provide complete information about the Drexel financing. An amendment to the tender offer filed with the SEC on October 7 still does not disclose either the interest rate of the notes or the identities of the notes' purchasers. In fact, the amendment includes a letter agreement between Ivanhoe Acquisition Corporation and Drexel providing that the purchaser shall not disclose "the names of any investors from whom commitments to purchase Increasing Rate Notes are sought or secured under any circumstances, unless, in the opinion of your counsel, such disclosure is required by law or legal process." Arguably, the Pickens Group may not have to disclose the information required by Item 4 of Schedule 14D-1 until after the offer closes. The amendment process has not cured the defects in this tender offer thus far.

I would reverse the district court and enjoin the tender offer pending full compliance with the Williams Act and with the requirements of Schedule 14D-1.