840 F.2d 220
 56 USLW 2478, Fed. Sec. L. Rep. P 93,633
 IU INTERNATIONAL CORPORATION, Plaintiff-Appellant,
v.
NX ACQUISITION CORP.; NEOAX, Inc.; Dyson-Kissner-Moran
Corporation; WM Financial Corp., Defendants-Appellees,
Securities and Exchange Commission, Amicus Curiae.
 No. 88-3013.
 United States Court of Appeals,
Fourth Circuit.
 Argued Feb. 1, 1988.
Decided Feb. 11, 1988.
Rehearing En Banc Granted Feb. 16, 1988.
 
 Paul Vizcarrondo, Jr., New York City, (Francis B. Burch, Jr., Piper & Marbury, Baltimore, Md., Wachtell, Lipton, Rosen & Katz, New York City, on brief), for plaintiff-appellant.
 Stephen P. Lamb (Skadden, Arps, Slate, Meagher & Flom, Wilmington, Del., George Beall, Mark D. Gately, Miles & Stockbridge, Baltimore, Md., on brief), for defendants-appellees.
 Eric Summergrad, Asst. Gen. Counsel (Daniel L. Goelzer, Gen. Counsel, Jacob H. Stillman, Associate Gen. Counsel, Lucinda O. McConathy, Sp. Counsel, Washington, D.C., on brief), for amicus curiae S.E.C.
 Before WINTER, Chief Judge, and MURNAGHAN and ERVIN, Circuit Judges.
 MURNAGHAN, Circuit Judge:
 
 
 1
 The plaintiff, IU International Corporation (IU), is the target of a tender offer by the defendants, a group of companies who formed defendant NX Acquisition Corporation (NX) to make the tender offer. NX commenced the offer on January 6, 1988, by filing required disclosure documents with the Securities and Exchange Commission (SEC) and by transmitting to IU shareholders an Offer to Purchase any and all IU shares for $17.50 per share. The offer was to expire February 3, 1988. At oral argument on February 1, 1988, counsel for defendants represented that NX has raised the offering price to $20.00 per share and extended the expiration date to February 12, 1988.
 
 
 2
 The Offer to Purchase disclosed that defendant NEOAX Inc. (NEOAX) had obtained commitment letters in aggregate amount of 416 million dollars from two banks: 311 million dollars to be used to acquire IU shares and 105 million dollars to refinance NEOAX debt. The offer stated that NEOAX intended to raise the remaining funds needed to buy the IU shares through the sale of securities to be underwritten by Drexel Burnham Lambert, Inc. (Drexel). The offer stated that Drexel had informed NEOAX that it was "highly confident" that it could arrange the placement of up to 360 million dollars of NEOAX debt securities and up to 40 million dollars of NEOAX cumulative preferred stock. The offer disclosed that defendant Dyson-Kissner-Moran Corporation had committed to purchase 10 million dollars of the preferred stock.
 
 
 3
 On January 13, 1988, IU filed an action in the United States District Court for the District of Maryland seeking to enjoin defendants from the purchase of IU shares pursuant to the tender offer. IU alleged that the defendants violated the Securities-Corporate Equity Ownership-Disclosure Act, Pub.L. No. 90-439, 82 Stat. 454 (1968) [hereinafter Williams Act] (codified as amended at 15 U.S.C. Secs. 78m, 78n (1981 & Supp.1987)). The alleged violation of the Williams Act was NX's failure to disclose, in the SEC filing prior to initiation of the tender offer, information regarding financing for the purchase of the remaining IU shares after exhaustion of the 311 million dollars in bank loans. There is no allegation that NX had information that it did not disclose. Rather, the allegation is that the Williams Act requires NX to have completed more substantial steps in acquiring financing, specifically to have known and disclosed "expected sources and expected terms" of the financing.
 
 
 4
 IU moved for a preliminary injunction against execution of the tender offer. The district court heard argument on January 20, 1988 and denied the motion from the bench. IU filed a notice of appeal on January 22, 1988. Briefs of the SEC, as amicus curiae, the parties, and a reply brief by IU were filed January 26, 27 and 28. We heard oral argument on February 1, 1988 and issued an order affirming the district court one day later. The order indicated that, as this opinion reflects, opinions stating views of the members of the court would follow.
 
 
 5
 The district court in denying the preliminary injunction considered each of the four factors set forth in Blackwelder Furniture Co. v. Selig Mfg. Co., 550 F.2d 189 (4th Cir.1977). It concluded that the balance of hardships favored NX, that IU failed to demonstrate a strong likelihood of success on the merits, and that the public interest would not be served by a preliminary injunction. We affirm the denial of the preliminary injunction on two bases. First, we hold that IU has no chance of success on the merits because the Williams Act does not impose a threshold requirement on what state financing must be in prior to commencement of a tender offer; the Williams Act only requires disclosure of whatever financing arrangements exist. Second, we hold that IU failed to establish irreparable harm at the time it appeared before the district court and at the time it argued before our panel.
 
 
 6
 The Williams Act, an amendment to the Securities Exchange Act of 1934, was enacted in 1968. It requires a party making a tender offer for more than 5% of a company's outstanding shares to file a statement with the SEC setting forth certain information. That statement must include, among other information,
 
 
 7
 the source and amount of the funds or other consideration used or to be used in making the purchases, and if any part of the purchase price is represented or is to be represented by funds borrowed or otherwise obtained for the purpose of acquiring, holding or trading such security, a description of the transaction and the names of the parties thereto.
 
 
 8
 15 U.S.C. Sec. 78m(d)(1)(B) (emphasis supplied). The Williams Act, both in its original enactment and by a 1970 amendment, authorized the SEC to implement its provisions. The SEC's regulations are set forth in 17 C.F.R. Secs. 240.13d, 240.13e, 240.14d, 240.14e, 240.14f. The form that the bidder files with the SEC is Schedule 14D-1, set out in 17 C.F.R. Sec. 240.14d-100.
 
 
 9
 The consideration to be used by NX in making the purchase of IU shares is to be represented by borrowed funds. Therefore, NX falls within the Williams Act requirement that it provide "a description of the transaction and the names of the parties thereto" for the lending arrangements in the disclosure document that it filed with the SEC. IU concedes that the requirement was met as to the bank financing but asserts a failure to meet the requirement as to the sale of NEOAX securities by Drexel. Our construction of the Williams Act provision finds that the requirement was met. We conclude that the Williams Act requires disclosure of whatever financing arrangements exist, but does not require that they exist in a particular form before commencement of a tender offer. A transaction that does not yet exist or unascertained parties thereto simply cannot be disclosed.
 
 
 10
 One reading of the Williams Act would require that lending commitments and the names of the parties thereto be disclosed, and by definition exist, before initiation of a tender offer. The Ninth Circuit recently rejected that theory. It held that a tender offeror was not required to have the terms of its financing arrangements settled at the time the tender offer commences. Newmont Mining Corp. v. Pickens, 831 F.2d 1448 (9th Cir.1987). A second reading, advanced by NEOAX and the SEC in the present case, finds no requirement of the Williams Act concerning the status of lending arrangements prior to an offer. A bidder need only disclose what exists. A third reading advanced by IU is an intermediate one. It would require offerors to disclose and therefore to have ascertained and to have revealed "expected sources and expected terms" of the offeror's borrowings. We adopt the second reading.
 
 
 11
 Five factors lead us to that conclusion. First, the Williams Act is primarily, though not exclusively, a disclosure statute. We therefore construe narrowly its "substantive" requirements. Second, the Williams Act is designed to maintain neutrality between bidder and target. Given a choice between plausible readings of a provision, we prefer the one yielding a neutral result. Third, the harms that IU suggests will result from our construction of the provision do not exist in the present case and will not generally exist. Fourth, even if those harms did exist, the construction advanced by IU does not obviate them any more than our construction. Fifth, our construction agrees with the SEC interpretation.
 
 
 12
 The Supreme Court has indicated that disclosure is the primary purpose of the Williams Act and that maintaining neutrality between bidder and target was the Congress' intent.
 
 
 13
 The purpose of the Williams Act is to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information regarding the qualifications and intentions of the offering party.... By requiring disclosure of information to the target corporation as well as the Securities and Exchange Commission, Congress intended to do no more than give incumbent management an opportunity to express and explain its position. The Congress expressly disclaimed an intention to provide a weapon for management to discourage takeover bids or prevent large accumulations of stock which would create the potential for such attempts. Indeed, the Act's draftsmen commented upon the 'extreme care' which was taken 'to avoid tipping the balance of regulation either in favor of management or in favor of the person making the takeover bid.'Rondeau v. Mosinee Paper Corp., 422 U.S. 49, 58-59, 95 S.Ct. 2069, 2076, 45 L.Ed.2d 12 (1975).
 
 
 14
 While it is a disclosure statute, the Williams Act does have "substantive" effects. The SEC filing that is required prior to commencement of the offer, the Schedule 14D-1, must disclose among other items: the purchase price, date of closing, number of shares sought, and members of the bidding group. IU argues that those items, while subject to later change, must exist and must be disclosed with an initial filing. One cannot, according to IU, state only that those items are subject to finalization. It urges a similar requirement for the statement of the source and amount of funds, particularly borrowed funds. However, there is a fundamental difference between the date, price, quantity and identity of the buyer on the one hand and a financing contingency on the other. The terms of the first four are essential to an offer, but the terms of the last is not. While the existence of a financing contingency is a material term of an offer and the fact of contingency must be stated, how the financing will ultimately occur is not essential to an offer. That difference means that only the terms of certain elements, like price, must be stated, and therefore must exist, for a tender offer to be valid under the Williams Act. We construe narrowly the substantive effect of a disclosure statute.
 
 
 15
 The legislative history of the Williams Act and the Supreme Court's construction of it note the neutrality between bidder and target embodied in the Act. A requirement that a bidder know (and consequently disclose) expected sources and hoped for terms of financing would favor targets. The requirement is an obstacle, of debatable moment, but an obstacle nonetheless, to a bidder. We prefer our construction because it more closely hews to the congressional intent of neutrality.
 
 
 16
 The parties and the SEC, as amicus curiae, focus on the harm that can befall target shareholders if details of financing arrangements are not disclosed. IU points out that target shareholders, in deciding to tender their shares, need to know the financing terms for several reasons. One, the terms evidence a view as to the financial strength of the successor entity. Two, the terms are highly relevant to the future performance of the successor entity. A high debt load, or oppressive conditions, would affect performance and significant events such as dividend payouts. No party before the court contests that (1) if the terms are known at the time of filing the Schedule 14D-1 they must be disclosed or that (2) if terms become known or change during the course of the offer, they will very likely be material changes for which an amendment is required and possibly necessitate an extension of the offer.
 
 
 17
 IU suggests two harms that could result from our construction of the Williams Act. First, target shareholders might not have sufficient time adequately to consider the terms of the financing if disclosure comes late; and second, without an initial disclosure requirement the bidder is under no legal obligation to have financing terms finalized, and disclosed, prior to the expiration of the offer.
 
 
 18
 The first answer to IU's claimed harms is that IU's construction, requiring "expected sources and expected terms" be initially disclosed, obviates neither harm. An amendment to a statement of "expected sources and expected terms" is equivalent to an amendment to a statement of nothing. The second answer is that neither harm exists in the present case. Counsel for defendants represented at oral argument that defendants will firm up their financing, amend their SEC disclosure, and disseminate the terms of the financing to IU shareholders at least five days prior to the expiration of the offer, permitting any stockholder to revoke any existing tender.
 
 
 19
 The third answer is that the harms will not generally occur. The SEC requires prompt payment after the expiration of a tender offer. 17 C.F.R. Sec. 240.14e-1(c). Counsel for the SEC indicates that under current SEC practice, payment is prompt when made within five days. It is highly unlikely that a bidder could delay the finalizing of financing until after expiration of the offer or, if it could, would undertake that risk.[1] The SEC indicates that if bidders undertook not to close financing until after the expiration of an offer then it would, under its antifraud provision authority, examine the situation in a case by case adjudication and on a rule making basis.
 
 
 20
 The SEC interpretation of the Williams Act points to the fifth factor counseling our decision. The Williams Act gives the SEC wide latitude in deciding what disclosures are necessary. The Ninth Circuit found the delegation of authority so broad that specific disclosure requirements are not within the mandate of the Williams Act but instead are within the SEC's discretion. See Newmont Mining, 831 F.2d at 1451.
 
 
 21
 The SEC appeared as amicus curiae in Newmont Mining and in the present case, and argued that neither the Williams Act nor SEC regulations create a substantive requirement regarding what state financing must be in before commencing a tender offer. Administrative interpretations are due deference. However, IU argues that the SEC took an opposite view on the matter soon after the passage of the Williams Act and it is that interpretation that is due deference.
 
 
 22
 The SEC admits of no inconsistency and we find none. IU points to testimony in 1970 of the then Chairman of the SEC, Hamer Budge, before the Senate Committee on Banking and Currency. The testimony was in connection with an amendment to the Williams Act that granted the SEC authority under section 14(e) of the Williams Act, 15 U.S.C. Sec. 78n(e), to proscribe fraud in tender offers. Section 14(e) is an antifraud provision and grants the SEC authority to proscribe conduct which, while not itself fraudulent, should be prohibited in order to prevent fraud. See Schreiber v. Burlington Northern, Inc., 472 U.S. 1, 11 n. 11, 105 S.Ct. 2458, 2464 n. 11, 86 L.Ed.2d 1 (1985).
 
 
 23
 Budge testified regarding how and why the SEC needed rule making authority under the antifraud section. He was asked for examples of areas of fraudulent practices used in tender offers that the proposed powers would prevent. See Additional Consumer Protection in Corporate Takeovers and Increasing the Securities Act Exemptions for Small Businessmen: Hearings on S. 3431 Before the Subcomm. on Securities of the Senate Comm. on Banking and Currency, 91st Cong., 2d Sess. 11 (1970). He introduced a memorandum that noted that one problem not dealt with by existing law was that "[t]he person who makes a tender offer may not have in hand the funds to pay for the securities he offers to purchase ... or a legally enforceable commitment to borrow such funds from [a] responsible person." Id. at 12. Budge testified that the SEC had enjoined a solicitation for shares when the bidders "did not have the funds to pay for the stock that they were asking people to deposit." Id. at 11. IU in the present case argues, as did the dissent in Newmont Mining, that Budge's testimony on this point is of great moment. See Newmont Mining, 831 F.2d at 1453-56 (Pregerson, J., dissenting).
 
 
 24
 We agree with the Newmont Mining majority and do not find Budge's testimony persuasive on the relevant issue. First, the testimony related to instances of fraud. Though not stated, the SEC may have had cause to enjoin the offer for fraudulent practices other than the mere lack of a lending commitment. Second, the SEC has never promulgated a regulation requiring a threshold level of certainty as to financing. Those two factors negate any notion that the SEC viewed lack of certainty in financing as fraudulent in and of itself.
 
 
 25
 The difference between fraud and the potential for fraud also distinguishes the Budge testimony, and supports our construction of the Williams Act. We agree that manipulations of the acquisition and disclosure of financing terms can be fraudulent. The SEC, at some point, might adopt the prophylactic measure of requiring disclosure of "expected sources and expected terms" or even require firm financing commitments prior to initiation of a tender offer. However, in the absence of an SEC action, we do not read the Williams Act to include such a requirement. Like the Newmont Mining decision, our decision is in accord with the only known decisions of other courts dealing with the issue. See Newmont Mining, 831 F.2d 1448 (9th Cir.1987) (citing Plaza Securities Co. v. Fruehauf Corp., 643 F.Supp. 1535 (E.D.Mich.1986); Warnaco, Inc. v. Galef, Civ. No. B-86-146 (PCD) (D.Conn. April 3, 1986), aff'd mem., 800 F.2d 1129 (2d Cir.1986)). We read the Act to require disclosure of what exits. No argument has been made that NX has not disclosed all it knows. We therefore affirm.
 
 
 26
 AFFIRMED.
 
 HARRISON L. WINTER, Chief Judge, dissenting:
 
 27
 The issue presented by this appeal--whether the Williams Act and the implementing SEC regulations require that a bidder disclose at the outset of a tender offer the expected sources and terms of all funds to be borrowed in financing the acquisition--is a narrow one. It has been considered by only one other court of appeals, Newmont Mining Corporation v. Pickens, 831 F.2d 1448 (9 Cir.1987), reh'g denied (Feb. 1, 1988), which held by a split vote that a representation like that in the instant case was compliance with the Act and the regulations. Judge Pregerson dissented, and I am in agreement with his views.
 
 
 28
 I think that the Act and the regulations require a sufficient disclosure of the terms of financing a tender offer for the full period of at least twenty days before the close of the offer to enable an investor in the corporation sought to be acquired to make a reasoned decision as to whether or not to tender. While the terms and conditions of the financing need not, in my view, be fixed in every detail, or unconditional, I am not persuaded that the bare disclosure that approximately $350 million of debt securities will be issued and sold, that it is anticipated that a portion of the debt securities "may bear interest at an increasing rate," that an undisclosed portion of them will be subordinated to other debts of the acquirer, and that Drexel Burnham has stated that "based on current conditions ... it is highly confident it can arrange the placement of (i) up to $360 million of Debt Securities [of NEOAX] ... in order to provide a portion of the financing for the Offer" is a disclosure in compliance with the Act or the regulations.[1]
 
 
 29
 I respectfully dissent.
 
 I.
 
 30
 To decide the case I think it unnecessary to look behind the terms of the Act and the regulation. Tender offers are regulated in part by 15 U.S.C. Sec. 78n(d) which provides that before making a tender, an offeror, who is the beneficial owner of more than 5 per centum of the class of equity securities sought to be obtained, must have first filed with the SEC a statement containing the information specified in 15 U.S.C. Sec. 78m(d). The provisions of Sec. 78m(d) which are applicable here are quite specific. The person inviting tenders must file a statement containing information with respect to:
 
 
 31
 the source and amount of the funds or other consideration used or to be used in making the purchases, and if any part of the purchase price is represented or is to be represented by funds or other consideration borrowed or otherwise obtained for the purpose of acquiring, holding, or trading such security, a description of the transaction and the names of the parties thereto....
 
 
 32
 15 U.S.C. Sec. 78m(d)(1)(B).
 
 
 33
 The SEC has authority to promulgate implementing regulations, and it has exercised that authority with respect to tender offers. The prescribed filing form requires the would-be acquirer to disclose its "source of funds", 17 C.F.R. Sec. 240.14d-100, and in the instructions as to how to comply, the regulation states:
 
 
 34
 (b) If all or any part of such funds or other consideration are or are expected to be directly or indirectly, borrowed for the purpose of the tender offer:
 
 
 35
 (1) Provide a summary of each loan agreement or arrangement containing the identity of the parties, the term, the collateral, the stated and effective interest rates, and other material terms or conditions relative to such loan agreement; and
 
 
 36
 (2) Briefly describe any plans or arrangements to finance or repay such borrowings, or if no such plans or arrangements have been made, make a statement to that effect.
 
 
 37
 (c) If the source of all or any part of the funds to be used in the tender offer is a loan made in the ordinary course of business by a bank as defined by section 3(a)(6) of the Act, the name of such bank shall not be made available to the public if the person filing the statement so requests in writing and files such request, naming such bank, with the Secretary of the Commission.
 
 
 38
 17 C.F.R. Sec. 240.14d-100, Item 4 of Schedule 14D-1.
 
 
 39
 This regulation must be read in conjunction with 17 C.F.R. 240.14e-1(a) which specifies that a tender offer must be held open for not less "than twenty business days from the date the offer is first published or sent or given to security holders...." This expands the seven-day minimum notice period for disclosures established by Congress: "seven days after the time definitive copies of the offer ... are first published or sent or given to security holders...." 15 U.S.C. Sec. 78n(d)(5) (emphasis added). SEC also requires a tender offer to remain open for at least ten business days from the date of any notice of increase or decrease in the class of the securities being sought or the consideration offered or the dealer's soliciting fee. 17 C.F.R. Sec. 240.14e-1(b). See 15 U.S.C. Sec. 78n(6), (7).
 
 
 40
 Thus I read the Act and the regulations to mean that a holder of equity securities who is invited to tender must be given at least twenty days notice of "a description of the transaction and the names of the parties thereto" of funds to be borrowed to finance the acquisition of securities which may be tendered. Since I view the primary purpose of the Act to afford a holder of equity securities sufficient information to make a reasoned decision of whether or not to tender when the offer to purchase is conditioned upon the obtention of funds to make payment--and only incidentally to provide that information in a neutral manner so as not to give either party a weapon to encourage or discourage takeover bids, to me it makes eminently good sense to require twenty-day disclosure of exactly what the Act and the regulations require.[2] I think it fairly obvious that a stockholder of IU International Corporation would wish to assess his chances of being paid for shares that he tenders because his tender may be accepted and payment is conditioned upon NEOAX's obtaining the funds to pay.
 
 II.
 
 41
 Both in briefs and in oral argument the would-be acquirer and the SEC urge two principal arguments. First they assert that the terms and conditions of the debt offering to acquire the stock are not known and cannot be known at the time that the tender is made. Second they assert that, as a practical matter, they will be known as the date for expiration of the tender offer approaches and the information will then be required to be disclosed. NEOAX represents in oral argument that shareholders of IU International will have five days within which to decide whether or not to tender or to withdraw a tender previously made.
 
 
 42
 These arguments do not persuade me because I read the Act and the regulations to require that stockholders of IU International have a right to twenty days' notice.[3] Of course, I would not contemplate that every term and condition of the proposed debt offering be in place before the tender is made. Whatever commitment is made by Drexel Burnham Lambert can be conditional or contingent upon events yet to occur. The interest rate on the debt securities can be stated within a range or by a formula using a recognized base such as the current rate of federal securities at the time of the offering or some other established index. In this connection it is significant that the acquirer is presently able to state that the debt securities will be subordinated to the other debt of the issuer and that they may bear interest at an increasing rate. The anticipated term of the debt securities, the security, if any, to be provided for them, the anticipated rate of interest, the voting rights, if any, of the purchasers of the securities in the first instance or in the event of a default are all matters which may affect the success of the proposed borrowing. In short, I think that the Act and the regulations require the disclosure, in at least conditional or contingent terms, of the principal terms of the contemplated debt offering. If in fact this cannot possibly be done, the remedy is to seek Congressional modification of the statute. The remedy is not to ask a court to alter the plain and unambiguous language of the statute.[4]
 
 
 43
 It may well be that, by amendment, some or all of the requisite information may become available before the tender offer expires. The regulations do require amendments to the tender registration as and when significant additional information is developed or significant changes occur. However, as I have said, I think it imperative that the requisite information be supplied at least twenty days before tenders are accepted. I do not think the Act vests in the tender offeror the discretion to decide when first to release material information on an offer. The SEC has exercised the discretion afforded it by Congress in this respect by establishing a twenty-day notice period for the original disclosures under Rule 14e-1(a), 17 C.F.R. Sec. 240.14e-1(a).[5] Nor do I think that Congress in adopting the Act intended to rely on economic forces or economic realities to cause a shareholder in a target company to be supplied the information to enable him to make a reasoned decision as to whether to tender.[6]
 
 
 44
 In summary, I think that the Act and the regulations are being violated by this tender. It follows that IU has demonstrated a strong likelihood of success, and it and its shareholders have shown irreparable harm because they are being deprived of their statutory rights. I would reverse and remand with directions to enjoin the offer until compliance with the Act and regulations is forthcoming.
 
 
 45
 ON PETITION FOR REHEARING AND SUGGESTION FOR REHEARING IN BANC
 
 
 46
 The appellant's petition for rehearing and suggestion for rehearing in banc were submitted to this Court. In a requested poll of the Court, a majority of judges voted to rehear the case in banc. A majority of judges having voted to grant rehearing in banc,
 
 
 47
 IT IS ORDERED that rehearing in banc is granted.
 
 
 48
 Entered at the direction of Chief Judge Winter.
 
 
 
 [1]
 While it is highly unlikely that a bidder would not have its financing firmed up and disclosed prior to expiration of the tender offer, it is possible, and target shareholders might be forced to decide to tender without financing information. That is the chief harm raised by IU in opposition to our construction. There is, however, a countervailing interest: the interest of shareholders so willing to sell at the offering price that he or she is willing to be locked in for a few days while the would be purchaser (here NX) uses its best efforts to firm up financing
 
 
 [1]
 In this case, NEOAX, Inc. and the other defendants, seek to acquire all of the outstanding common stock of IU International Corporation, and thereafter to merge IU into NEOAX or one of its subsidiaries. The acquisition will be financed by various borrowings by NEOAX. Significant for this case, the tender is conditioned upon NEOAX's ability to complete the borrowings. Shares may not be withdrawn after acceptance but payment is not required to be made immediately upon acceptance. There is uncertainty in the regulations as to when payment must be made after acceptance of tendered shares. They state only that payment must be made "promptly". 17 C.F.R. Sec. 240.14e-1(c). The SEC asserts that the payment may be required within five business days; IU says that payment may be deferred for as long as thirty days. Whether five days, thirty days, or some period in between, the ability of NEOAX to complete its borrowings may be a matter of prime importance to shareholders of IU in determining whether to tender their stock since they may not withdraw their stock after the tender offer closes
 
 
 [2]
 The purpose of the Williams Act is to protect security holders by ensuring "that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information...." Piper v. Chris-Craft Industries, Inc., 430 U.S. 1, 35, 97 S.Ct. 926, 946, 51 L.Ed.2d 124 (1977) (internal quotation omitted). Congress wished that the Act place "investors on an equal footing with the takeover bidder." Id. at 30, 97 S.Ct. at 943. Accord, Edgar v. MITE Corp., 457 U.S. 624, 633, 102 S.Ct. 2629, 2636, 73 L.Ed.2d 269 (1982). Congress adopted the disclosure provision of 15 U.S.C. Sec. 78n in 1968:
 in response to the growing use of cash tender offers as a means of achieving corporate takeovers.... The proliferation of cash tender offers.... removed a substantial number of corporate control contests from the reach of existing disclosure requirements of the federal securities law.
 Piper, 430 U.S. at 22, 97 S.Ct. at 939.
 The goals of neutrality and disclosure are generally reconcilable. "Congress sought to protect the investor not only by furnishing him with the necessary information but also by withholding from management or the bidder any undue advantage that could frustrate the exercise of an informed choice." Edgar v. MITE Corp., 457 U.S. at 634, 102 S.Ct. at 2636.
 Without knowledge of who the bidder is and what he plans to do, the shareholder cannot reach an informed decision. He is forced to take a chance. For no matter what he does, he does it without adequate information to enable him to decide rationally what is the best possible course of action. This is precisely the kind of dilemma which our Federal securities laws are designed to prevent.
 S.Rep. No. 550, 90th Cong., 1st Sess. 2 (1967); H.R.Rep. No. 1711, 90th Cong., 2d Sess. 2 (1968), reprinted in 1968 U.S.Code Cong. & Admin.News 2811, 2812. The legislative history directly addressed any possible conflict between neutrality and disclosure:
 The bill avoids tipping the balance of regulation either in favor of management or in favor of the person making the takeover bid....
 While the bill may discourage tender offers or other attempts to acquire control by some who are unwilling to expose themselves to the light of disclosure, the committee believes this is a small price to pay for adequate investor protection. In fact, experience under the Securities Act of 1933 and the Securities Exchange Act of 1934 has amply demonstrated that the disclosure requirements of the Federal securities acts are an aid to legitimate business transactions, not a hindrance.
 Id. at 2813-14 (emphasis added).
 
 
 [3]
 NEOAX's suggestion that five days' notice is sufficient contravenes the Commission's twenty-day notice period, 17 C.F.R. Sec. 240.14e-1(a). It is also contrary to Congress' provision for at least seven days' notice "after the time definitive copies of the offer" are sent to shareholders. 15 U.S.C. Sec. 78n(d)(5)
 
 
 [4]
 I do not question that SEC may have considerable flexibility in its rule-making authority and that a rule once made may be altered. I find it significant, however, that SEC's initial administrative interpretation of the Act was to require disclosure of the data I would hold must still be required. See Newmont Mining Corporation v. Pickens, 831 F.2d at 1454-55 (Pregerson, J., dissenting)
 
 
 [5]
 In oral argument, the SEC contended that it had discretion to determine the length of the notice period for subsequent disclosures of the terms of NEOAX's borrowing, citing a nonbinding interpretative release it issued last year. 52 Fed.Reg. 11458 (April 9, 1987). However, that release only concerned the Commissions' views "with respect to the disclosure and dissemination of material changes in tender offer materials previously provided to security holders, in accordance with Rules 14d-d(c) [sic]." Id. (emphasis added). Rule 14d-4(c), 17 C.F.R. Sec. 240.14d-4(c), provides in part:
 Publication of changes. If a tender offer has been published or sent or given to security holders ... a material change in the information published, sent or given to security holders shall be promptly disseminated to security holders in a manner reasonably designed to inform security holders of such change....
 This is not applicable to the issue before us. We are concerned with what information must be provided at the outset of the tender offer, and therefore the pertinent SEC regulation is Rule 14e-1(a), 17 C.F.R. Sec. 240.14e-1(a) (see supra ) by which the SEC long ago determined the notice period for required disclosures at the outset of tender offers: twenty days.
 
 
 [6]
 In this connection, it is important to note that the SEC, after construing the disclosure provisions as not requiring publication of expected financing arrangements at the outset of a bid, must perforce rely upon economic realities to prevent a bidder from disclosing financing arrangements after the tender offer period has closed. It argues that a bidder "almost certainly must have financing arrangements by the time the tender offer is ready to be concluded, or else it will not have the cash in hand for prompt payment." Appellate Br.SEC at 22 (emphasis added). If the status of the bidder's financing does not materially change before the offer closes, the requirement that material changes be disclosed, 240 C.F.R. Secs. 240.14d-4(c), 240.14d-6(d), will not be triggered. Therefore, there can be no legal requirement that a bidder disclose its financing arrangements before a bid closes unless it is required that financing arrangements--contingent or final--be disclosed at the outset of the bid in accordance with 15 U.S.C. Sec. 78m(d)(1)(B) and 17 C.F.R. Sec. 240.14d-100
 A regulation under the antifraud provision, Rule 14e-1(c), 17 C.F.R. Sec. 240.14e-1(c), requires only prompt payment for shares after the tender offer closes. See supra. The SEC's restrictive interpretation of the disclosure provisions thus puts it in an anomalous position. It invokes the Act's antifraud provisions and regulations to support its contention that disclosure after the bid closes is discouraged and discourageable, but it must rely on allegations of economic realities, unsupported by the record before us, to prevent complete circumvention of the Act's clear disclosure requirements.