CRTF CORPORATION, Plaintiff,

v.

FEDERATED DEPARTMENT STORES, INC., Charlotte Beers, Philip Caldwell, Robert A. Charpie, Daniel W. LeBlond, Howard Goldfeder, Howard W. Johnson, Norman S. Matthews, G. William Miller, Donald J. Stone and Will M. Storey, Defendants.

R.H. MACY & CO., INC. and FDS Acquisition Corporation, Plaintiffs,

v.

CAMPEAU CORPORATION, CRTF Corporation and Robert Campeau, Defendants.

Nos. 88 CIV 0487 (LBS), 88 CIV 1548 (LBS).

United States District Court, S.D. New York.

April 14, 1988.

Cravath, Swaine & Moore, New York City (Frederick A.O. Schwarz, Jr., Robert F. Mullen, Ronald S. Rolfe, Allen Finkelson, Sandra Grannum, Robert A. Kindler, of counsel), and O'Sullivan Graev & Karabell, New York City (Henry B. Gutman, J. Douglas Richards, John S. Beckerman, of counsel), for CRTF Corp., Campeau Corp. and Robert Campeau.

Skadden, Arps, Slate, Meagher & Flom, New York City (Stuart L. Shapiro, Samuel Kadet, Rodman Ward, Jr., Edward Welch, Constance Huttner, Joseph Guglielmelli, Jeremy Berman, David Cohen, Anthony Clark, of counsel), and Morris, Nichols, Arsht & Tunnell, Wilmington, Del. (A. Gilchrist Sparks, III, Lawrence A. Hamermesh, Kenneth J. Nachbar, Michael Houghton, Robert J. Valihura, Jr., of counsel), for Federated Dept. Stores, Inc. and other named defendants.

Weil, Gotshal & Manges, New York City, Dennis J. Block, Joseph S. Allerhand, Andrea J. Roth, David J. Berger, for R.H. Macy & Co., Inc. and FDS Acquisition Corp.

## OPINION

SAND, District Judge.

### SUMMARY

We summarize herein several rulings made in open court during the course of proceedings in connection with Plaintiff's application for preliminary injunctive relief. We restate these rulings substantially as set forth in our oral Opinions with minor stylistic changes and additional citation of authority. Although the controversy has since been resolved by a consensual agreement among the parties, the issues presented herein appear to be sufficiently recurring to warrant issuance of this Opinion.

We have held:

A) that in determining a tender offeror's standing to challenge a target company's "Poison Pill" and/or a state's takeover statute, a court should determine whether the offer is a good-faith, realistic offer; to this end, the court may consider all of the facts and circumstances relating to the Plaintiff's past history, if any, its current financing capability, and the extent of its investment in the instant project;

B) that as part of the obligation of a Board of Directors of a Delaware corporation to conduct an "auction" in a manner which will maximize the benefits to the shareholders once the corporation is the target of competing takeover bids and the Board has determined that the corporation is to be sold, the Board may selectively invoke or waive rights under a previously adopted "Poison Pill" in order to further the auction and to raise the bidding;

C) that the Court would not overrule the Board of Directors' determination that the auction was still in progress, especially in the absence of a representation by the bidding party seeking preliminary injunctive relief that it believes its bid is the higher (or highest), and that in the absence of a still higher, later, competing bid, it has made its highest and final bid;

D) that the revision of an offer from a single-tier, all-cash offer to a two-tiered all-cash offer constitutes an "amended" offer rather than a "new" offer, and therefore can have an expiration date of ten rather than twenty business days after its promulgation.

## INTRODUCTION

Recent experience has shown us that the early resort to litigation in the typical hostile takeover struggle places the courts in a unique and sometimes anomalous posture.[1] This occurs primarily because the initial tender offer is likely to be a mere opening bid regarded by the parties and the financial markets as a tentative feeler. Despite this volatile state of affairs, either the offeror or the target is likely to seek immediate judicial relief, seeking to enlist the court as its ally in the battle being waged in the marketplace. Thus, although courts usually are involved when the parties have exhausted their efforts to resolve a controversy and are at an impasse, here judicial intervention is sought at the earliest stages of the dealings between the parties.

The relief sought may be a challenge by the target to the accuracy of the offeror's SEC or state law filings, or an application by the offeror to enjoin the target from utilizing defensive measures available to it under its by-laws (such as a "Poison Pill") or recently adopted state takeover statutes. The offeror may also seek to prevent the target from entering into arrangements with third parties that would frustrate the offer.

The tender offer usually has an early expiration date. Enormous sums of money are often at stake. Stockholders and the financial community at large are concerned and seek guidance and certainty from any source and especially from the court. The pressures to rush into the fray are therefore great indeed. Counter-balancing these pressures are a strong reluctance to interfere with the unfettered forces of the market, and a concern that a premature adjudication will be merely an advisory opinion rendered while negotiations are still underway.

In striking a balance between the apparent urgent need for prompt adjudication and the desire not to be a mere player on the takeover scene, courts have invoked a number of concepts designed to test and measure the appropriateness of judicial intervention. These include the requirements that a case and controversy in fact exist between the parties; that the controversy be one which the Plaintiff has standing to bring to the courts; that the controversy be ripe for adjudication and, where injunctive relief is sought, that the movant would suffer irreparable injury absent judicial intervention.

---

1. Although many of the observations in this introduction are prompted by our role in this case, nothing herein should be viewed as a criticism of the extraordinarily able and knowledgeable counsel who appeared in this litigation.

## OPINION OF FEBRUARY 11, 1988
### (MOTION TO DISMISS)

On January 25, 1988, CRTF Corp. ("CRTF"), a New York subsidiary of Campeau Corp., commenced a cash tender offer for all shares of Federated Department Stores ("Federated"), originally at a price of $47 per share. In supplemental filings made to the Court today, the Court is advised that the amount of that cash offer was revised upward.

On the same day it filed the tender offer, CRTF filed suit against Federated in this Federal District Court, seeking injunctive and declaratory relief against Federated and some of its officers and directors:

1) claiming breach of fiduciary duty and demanding invalidation of a Rights Plan that Plaintiff describes as a "Poison Pill"; and

2) claiming violation of the federal securities law, § 14(e) of the Securities Exchange Act of 1934, alleging that Federated's press release of January 21, 1988 was false and misleading and was made in anticipation of a tender offer.

CRTF also sought expedited discovery at that time.

The tender offer is due to expire on February 22 unless extended and was originally conditioned on several things, including:

1) approval of the offer by the Board of Directors, a condition which recent supplemental filings indicate has now been removed;

2) the invalidation of the Poison Pill or the redemption of the Rights by the Board of Directors;

3) the absence of valid conflicting legislation; and

4) CRTF's obtaining sufficient financing.

Defendants moved promptly to dismiss on several grounds, including:

1) ripeness and standing issues, asserting that:

a) the lack of committed financing precluded ripeness, standing and the existence of a case or controversy;

b) the complaint is to some extent based on what Plaintiff expects the directors to do in the future;

c) Plaintiff should proceed by shareholders' derivative suit; and

d) certain of the alleged wrongs occurred prior to Plaintiff's ownership of stock in the company;

2) the existence of indispensable parties not joined in this action, whose joinder would destroy diversity jurisdiction;

3) a lack of pendent jurisdiction because of the inapplicability of the federal securities claim; and

4) a claim that the Court should in its discretion refrain from taking jurisdiction because of the "internal affairs doctrine."

Finding the ripeness and standing issues to be troublesome, the Court on February 2 wrote to the Securities and Exchange Commission ("SEC") requesting that that agency submit an Amicus Curiae Brief as to those threshold questions. The letter of the Court to the SEC has previously been marked as a Court Exhibit in these proceedings, and the SEC's brief is also on file with the Court. (Relevant excerpts from the brief are quoted below.)

Also on February 2, Plaintiff filed a First Amended Complaint, adding a challenge to the constitutionality of the Delaware takeover statute, enacted that very day.

Certification under 28 U.S.C. § 2403(b) was forwarded to the Attorney General of the State of Delaware on February 3, and the Attorney General of Delaware has been advised of today's proceeding. We were advised by telephone within the past hour that there is en route to the Court a communication from the Attorney General, the substance of which is that, because the motion now before the Court might be dispositive, his office sees no need to intervene in the case at the present time, as such intervention would be premature.

Upon receipt of a telephone call yesterday from the SEC informing us that its brief would arrive today, the Court advised the parties that it would rule today on the motion to dismiss. It also invited the parties to supplement the record with respect

to any changes that might have occurred and as to any filings and financing arrangements entered into over the past few days. Affidavits were received midday today, apprising the Court of some recent developments and including copies of subsequent SEC filings, that is, subsequent to the last appearance of the parties before me.

The issues raised by the motion to dismiss would warrant disposition by a formal opinion with greater elaboration and citation of authority than the circumstances permit. The Court notes that it is now late afternoon on Thursday, February 11, that Friday, February 12, and Monday, February 15, are official Court holidays, and that the tender offer, unless extended, expires on February 22. The Court reserves the right to edit this Opinion stylistically but not to alter the substance of these rulings.

■ We deal first with the motion to dismiss insofar as it is predicated on an alleged lack of diversity jurisdiction. The Defendants claim that all directors, not simply the four directors named in the complaint, are indispensable parties and must be joined. Defendants further assert that if all were joined, there would not be complete diversity of citizenship because some of the directors, like the Plaintiff, are citizens of New York.

"The directors and officers of the corporation, unless individually accused of wrongdoing, usually will not be regarded as indispensable parties to actions involving the corporation." 7 C. Wright, A. Miller and M. Kane, Federal Practice and Procedure, § 1615 at 233–34 (footnote omitted).

The requirement that a director be joined if individually accused of wrongdoing exists so that he or she will be able to mount a defense when the relief sought would be assessed against him or her individually, and so that the relief sought could indeed be granted against him or her should the Plaintiff prevail. *See Dowd v. Front Range Mines, Inc.*, 242 F.Supp. 591, 597 (D.Colo.1965) (*citing* 13 Fletcher Cyclopedia Corporations, § 5996, at 549); *see also Miller v. American Telephone &* *Telegraph Co.*, 394 F.Supp. 58, 65 (E.D.Pa. 1975), *aff'd* 530 F.2d 964 (1976) ("A stockholders' derivative suit charging fraudulent or improper action on the part of the corporation's directors, which seeks relief against them as individuals, cannot proceed in the absence of proper joinder of the directors as defendants.") (*citing Castner v. First National Bank of Anchorage*, 278 F.2d 376, 384 (9th Cir.1960)).

Thus, a director who was accused of having knowledge of alleged collusion and fraud, whom plaintiffs sought to enjoin personally from enforcing a state judgment allegedly obtained through that fraud, was a "proper party" (and presumably, in fact, indispensable), while a director against whom no relief was sought could have the case dismissed against him. *Dowd v. Front Range Mines, Inc.*, 242 F.Supp. at 597. Where the relief sought included an accounting on behalf of the corporation by individual officers and directors, they were indispensable parties. *Sylvia Martin Foundation Inc. v. Swearingen*, 260 F.Supp. 231, 234 (S.D.N.Y.1966).

Similarly, where the issue was as to which directors were to continue to serve as directors after a contested election, all of the directors were indispensable parties because "a judgment [would] affect their individual interest," and the corporation had an interest in avoiding the multiple litigation that would certainly follow if all were not joined. *Prescott v. Plant Industries, Inc.*, 88 F.R.D. 257, 261 (S.D.N.Y. 1980).

■ Where the directors are accused of breach of fiduciary duty for actions taken as a Board, this does not constitute the sort of individual accusation that requires the joinder of all directors. With respect to shareholders' derivative suits, Professor Moore has stated: "Since those who have wronged the corporation are tortfeasors whose liability is both joint and several, any one or more of them may be joined as the plaintiff sees fit." 3A J. Moore's Federal Practice, ¶ 9.13[1] at 19–227 (1987).

■ At least one director must be named in a shareholders' derivative suit, because

there the corporation is in some sense a plaintiff even if named as a defendant, and thus, the suit would otherwise suffer from the total absence of a substantial defendant. *Young v. Colgate–Palmolive Co.*, 790 F.2d 567, 572–73 (7th Cir.1986); *Miller v. AT & T*, 394 F.Supp. at 65; *Isaac v. Milton Mfg. Co.*, 33 F.Supp. 732, 737–38 (M.D.Pa. 1940).

However, not even a majority of directors need be joined when the relief sought is corporate action that a court can order. Thus a suit for payment of a dividend was allowed to proceed where only three of the twelve directors had been joined. *Kroese v. General Steel Castings Corp.*, 179 F.2d 760 (3d Cir.1949). The court reasoned that where the relief would entail not the exercise of business judgment by the directors but merely their performance of the ministerial tasks required to effect the court's judgment, there was no need to join even a majority of them. *Id.* at 762–64.

■ Where the joinder of certain directors would defeat the court's jurisdiction, the general rule is now that, absent the likelihood of prejudice to the unjoined directors, the case should proceed without them. *See* 7 C. Wright, A. Miller and M. Kane, Federal Practice and Procedure, § 1610 at 147–48 (1986); *Duman v. Crown Zellerbach Corp.*, 107 F.R.D. 761, 763 (N.D.Ill., E.D.1985). Where a suit was brought against a benefits "Plan," its administrator, and its twelve trustees, the Plaintiff was allowed to drop two trustees and the administrator, who had previously been joined but whose presence would destroy diversity, because any judgment for the Plaintiff would almost certainly be settled out of the Plan's, not the individuals', assets. *Prescription Plan Service Corp. v. Franco*, 552 F.2d 493, 497 (2d Cir.1977).

This rule appears to be particularly valid with respect to the type of suit at issue here. In a recent case in this district where the relief sought was an injunction against corporate action to implement a rights plan, the case was adjudicated despite the absence of one director whose joinder "apparently ... would have destroyed diversity." *Amalgamated Sugar Co. v. NL Industries*, 644 F.Supp. 1229, 1231 (S.D.N.Y.1986), *aff'd*, 825 F.2d 634 (1987). Where the relief sought was an injunction compelling the defendant corporation to redeem rights in a "poison pill" controversy, and seven of the thirteen directors were not amenable to suit in Illinois because of the lack of personal jurisdiction over them, the Court specifically found that those directors were not indispensable parties. *Duman v. Crown Zellerbach Corp.*, 107 F.R.D. at 763.

We thus find that the seven unnamed directors of the defendant are not indispensable parties and that the Court does not lack diversity jurisdiction.

(We note that defendants further urged that there was no pendent jurisdiction because there was no valid federal securities claim against Federated. We believe that this ground for the motion was mooted by the amendment to the complaint, which now includes a challenge to the constitutionality of the Delaware statute.)

■ We turn next to the motion to dismiss insofar as it is predicated on the "internal affairs doctrine." Defendants claim that under the internal affairs doctrine announced in *Rogers v. Guarantee Trust Co.*, 288 U.S. 123, 53 S.Ct. 295, 77 L.Ed. 652 (1933), cases involving the internal affairs of a corporation should be decided only in the corporation's home state. Under *Rogers*, when "considerations of convenience, efficiency and justice point to the courts of the state of the corporate domicile as appropriate tribunals for the determination of the particular case," the home state should be the forum. *Id.* at 130–31, 53 S.Ct. at 297–98.

As to choice of law, it is true that a New York State Court, and hence a Federal Court sitting in the State of New York, must apply the law of the state of incorporation in deciding a case involving the "internal affairs" of a foreign corporation. *See Hart v. General Motors Corp.*, 129 A.D.2d 179, 517 N.Y.S.2d 490, 493 (A.D., 1st Dept. 1987).

However, recent New York case law shows that decisions as to whether to exercise jurisdiction over such cases are made on essentially the same basis as a forum non conveniens determination, and the internal affairs rule is sometimes considered merely an element of forum non conveniens. *See Hart v. General Motors Corp.*, 517 N.Y.S.2d at 494; *Broida v. Bancroft*, 103 A.D.2d 88, 478 N.Y.S.2d 333, 335 (A.D., 2d Dept. 1984); *Mantei v. Creole Petroleum Corp.*, 61 A.D.2d 910, 402 N.Y.S.2d 822, 823 (A.D., 1st Dept. 1978).

This approach is based on the United States Supreme Court's decision in *Koster v. Lumbermen's Mutual Co.*, 330 U.S. 518, 67 S.Ct. 828, 91 L.Ed. 1067 (1947), which suggests that Justice Stone's dissent in *Rogers v. Guarantee Trust Co.*, 288 U.S. at 145, 53 S.Ct. at 303, sets forth a good dividing line as to which internal affairs of a corporation should be decided only in their home state, that is, those affairs that involve questions of *administration* of the corporation's affairs. *Broida v. Bancroft*, 478 N.Y.S.2d at 335.

As Judge Weinfeld has noted: "Although there is no rigid generalized rule as to what constitutes 'internal affairs' for this purpose, courts have declined jurisdiction where a decision would affect corporate structure or policy, but have retained jurisdiction over cases involving breach of fiduciary duty, fraud, or contracts." *Prescott v. Plant Industries, Inc.*, 88 F.R.D. 257, 261 (S.D.N.Y.1980).

■ We turn then to the issues relating to lack of standing, ripeness and the existence of a case or controversy. The Plaintiff alleges that it has owned shares of Federated since October 28, 1987. With respect to this aspect of the issue, the Defendants claim that the case should be dismissed because Plaintiff did not own shares at all times relevant to all of its allegations of breach of fiduciary duty.

We note that Plaintiff alleges a continuing wrong with respect to at least the existence of the so-called "Poison Pill." (The parties will understand that I use that as a shorthand and do not intend by the use of that now well-accepted term to indicate

any views on the merits of their contention that it is appropriately labeled as a "poison pill.") Thus, we will not dismiss the claim on this basis, because of the allegation of continuing wrong.

Defendant also claims that Plaintiff can only bring a suit of this nature as a shareholders' derivative suit. We believe that our decision on standing, which I am about to announce, fully disposes of this objection.

■ The tender offer contains a disclaimer of present financial ability to consummate the proposed offer. Plaintiff has presented affidavits from Kenneth Colburn, a Managing Director of First Boston, which is acting as financial advisor to CRTF and as dealer manager in connection with its tender offer, alleging that he believes "that the Poison Pill and the Delaware Bill [since enacted into law] are an immediate and substantial impediment to CRTF's ability to secure the financing necessary for the offer." Affidavit of Kenneth H. Colburn, in Opposition to Defendant's Motion to Dismiss, dated February 1, 1988, at ¶ 3. Mr. Colburn also alleges that, in order to obtain commitments for the more than $4 billion needed at the offering price of $47 per share, CRTF would have to pay in excess of $20 million. *Id.* at ¶ 6.

Plaintiff has not alleged the existence of any committed financing nor of any statement by First Boston that the latter is "highly confident" that, in the absence of the Poison Pill and the Delaware legislation, it would be able to arrange the level of financing called for to effect the tender offer. Indeed, as noted, the tender offer contains disclaimers and conditions with respect to ability to finance.

Typically, an initial tender offer is regarded as a tentative opening ploy, subject to revision with respect to its terms and upward price adjustment. The Court may judicially note that the financial community, whose beliefs are reflected in such matters as the price at which the stock is traded, so regards the initial tender offer. As the Court noted in *Newmont Mining Corp. v. Pickens*, 831 F.2d 1448, 1451 (9th

Cir.1987): "The SEC has consistently permitted amendments to tender offers and has never regarded the original tender offer statement as final." (*citing* 17 C.F.R. § 240.13d–2 (1975); 17 C.F.R. § 240.14d–6(d) (1987)).

It is indeed anomalous that the world at large may recognize the tentativeness of such an offer but that a federal court, which generally deals only in concrete, ripened controversies, can be asked to lay aside all else and adjudicate at breakneck speed serious constitutional questions raised by such an offer.

The Ninth Circuit has recently determined that a valid tender offer existed under the Williams Act where a party had made an offer as to which it had approximately two-thirds committed financing (approximately $2.1 billion), and a letter from its dealer manager stating that the dealer manager was "highly confident" that it could arrange the remaining one-third financing (approximately $1.1 billion). *Newmont Mining Corp.*, 831 F.2d at 1449.

This Court perceives the question of whether a valid tender offer can be made as implicating different considerations from those presented by the question of whether the making of a tender offer confers standing to contest, for example, the provisions adopted by a board of directors. The considerations that impel an early disclosure and issuance of a tender offer are not necessarily the same considerations that determine questions of standing.

We have been directed to no case that specifically addresses the question of whether the requirements of ripeness, standing and existence of a case or controversy are met, where a party making a tender offer comes into federal court seeking the invalidation of a poison pill and of a takeover statute:

1) without any allegation of committed financing; and

2) without any allegation that "but for the existence of the poison pill and of the takeover statute" the party's dealer manager is "highly confident" that financing would be forthcoming.

We believe that with respect to the question of standing in the absence of at least a "highly confident" representation or its equivalent, this is a case of first impression.

The Plaintiff claims that if it were found not to have standing to bring this suit, a Catch–22 situation would ensue. Plaintiff claims that the purpose of the allegedly invalid Poison Pill and the allegedly unconstitutional takeover statute—that purpose being the chilling of hostile tender offers—would be fulfilled if Plaintiff could not bring suit without a show of financing. This is because the very existence of the Pill and the statute are impediments to that financing, according to Plaintiff. Thus, Plaintiff alleges, it would have no recourse, and the Pill and the statute that Plaintiff claims are invalid and unconstitutional would therefore have their intended effect and would go unchallenged. In response, Federated cites examples of tender offers made in the recent past in which firm financing has been in place, conditional on the nullification of anti-takeover provisions.

The SEC responded today to our questions as to the threshold issues of ripeness, standing and the existence of a case or controversy. It is the Commission's view that:

> "[t]he substantial efforts and expenditures necessary for a person to commence a tender offer establish a 'personal stake' in the controversy sufficient to satisfy that standing requirement. Awaiting greater assurances of financing will add little or nothing to clarify the issues and can, instead, cause substantial injury to the plaintiff."

SEC Amicus Curiae Brief, dated February 10, 1988, at 2.

It is thus the position of the SEC that compliance with the Williams Act and submission of the filings required by that Act are in and of themselves sufficient to confer standing.

The SEC goes on to state in its submission:

> "A bidder such as CRTF, by the time it commences a tender offer, has taken significant steps and made major financial

commitments in retaining, at a minimum, attorneys and investment bankers (CRTF's Offer indicates, at 29, that CRTF paid its investment banker an initial fee of $1.5 million)."

*Id.* at 6 (footnotes omitted).

The SEC also notes that in this case, where the tender offer was for $4.3 billion, the initial nonrefundable fee paid by CRTF in connection with its Schedule 14D–1 filing amounted to $850,336. *Id.* at 7.

Some of the most relevant cases as to the relationship between financing and the ripeness/standing/case-or-controversy issues involve challenges to allegedly discriminatory zoning laws. These cases, on which Plaintiff relies, support the propositions that:

1) there need be no firm financing commitment where an aspect of the injury alleged is that the conduct or statute complained of is to some extent preventing the plaintiff from obtaining such financing; and

2) there need be no assurance that the project will go forward if the Court grants the relief requested.

In *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 261–262, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977), the Supreme Court found that a developer had standing to seek injunctive relief, stating:

> "An injunction would not, of course, guarantee that Lincoln Green will be built. MHDC would still have to secure financing, qualify for federal subsidies, and carry through with construction. But all housing developments are subject to some extent to similar uncertainties. When a project is as detailed and specific as Lincoln Green, a court is not required to engage in undue speculation as a predicate for finding that the plaintiff has the requisite personal stake in the controversy. MHDC has shown an injury to itself that is 'likely to be redressed by a favorable decision.'"

(*citing Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976)).

In that case, MHDC had entered into a land purchase contract contingent upon its securing rezoning, and it had spent several thousand dollars on the plans for Lincoln Green and on the studies submitted to the Village in support of the petition for rezoning. On these facts, the Court considered inaccurate the argument that MHDC had suffered no economic injury, and reaffirmed that economic injury is not the only kind of injury that can support a plaintiff's standing. *Id.* 429 U.S. at 262–63, 97 S.Ct. at 561–62.

In another zoning case, where the potential unavailability of federal funding for the development was the basis for the challenge to plaintiff's standing, the Second Circuit found that while "those who have absolutely no realistic financing capability have no standing, ... [i]ndeterminancy of financing alone ... is not enough to dismiss such an action, since the multitude of factors affecting ultimate financing capability are too variable to permit certainty in prediction." *Huntington Branch, NAACP v. Town of Huntington,* 689 F.2d 391, 394 (2d Cir.1982), *cert. denied,* 460 U.S. 1069, 103 S.Ct. 1523, 75 L.Ed.2d 947 (1983).

The court continued: "Private lenders, as well as government agencies, will be understandably reluctant to make sizable commitments for funds for projects which violate zoning laws and which, at best, cannot be started before years of litigation are completed. In such circumstances, dismissal of a complaint because of a lack of committed financing may well prevent any litigant from challenging a zoning ordinance." *Id.*

Other cases are to the same effect. Where, for example, a defendant city had blocked the plaintiff developer's access to state revenue bond funding, and where the defendant challenged the suit on ripeness grounds, the Eighth Circuit has recently found that where the complaint alleged that the city, "for a constitutionally impermissible reason, has blocked the plaintiff's access to public financing for at least a year," the injury alleged was "real, definite, and complete." *Meadows of West*

*Memphis v. City of West Memphis, Arkansas,* 800 F.2d 212, 214 (1986).

One can distinguish the exclusionary zoning cases, and the other cases relied on by Plaintiff, from tender offer cases for at least two significant reasons. One relates to the different context and motivation of the parties. Thus, in *Arlington Heights* the Court noted: "[The plaintiff's] interest in building Lincoln Green stems not from a desire for economic gain, but rather from an interest in making suitable low-cost housing available in areas where such housing is scarce." 429 U.S. at 263, 97 S.Ct. at 562.

The point is not that civil liberties plaintiffs enjoy any privileged status with respect to standing. The point is that an expanding view of standing in cases such as *Arlington Heights* does not present the danger of litigation initiated for improper economic reasons. To put the matter colloquially, greenmailers and strike suiters, that is, those who would seek to initiate litigation not for the purpose of obtaining their professed objectives but to embarrass management in the hopes of being bought off, are not likely to bring suits to challenge exclusionary zoning.

A second consideration is that in cases such as *Arlington Heights*, the suits before the court often constitute the sole means for judicial determination of the issues presented. Here, however, clearly appropriate means of raising these challenges are available: for example, stockholders' derivative suits. Indeed, such suits are pending, challenging the same provisions as are challenged in this action. We recognize CRTF's contention that the interests of the plaintiffs in those suits differ from and are sometimes adverse to CRTF's interests, and we believe that that point has force. The Court is noting only that, unlike in some zoning cases, here a denial of standing to Plaintiff will not preclude all judicial review.

The Supreme Court has told us in *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1974), that: "In essence the question of standing ... involves both constitutional limitations on federal court jurisdiction and prudential limitations on its exercise."

■ We consider both aspects of the question. Here the balance must be struck between a requirement of firm financial commitment, which would in this Court's opinion be a too stringent and preclusive requisite to standing, and the allowance of standing to anyone who for any reason and with no realistic financial capacity seeks the invalidation of corporate bylaws or of takeover statutes. We believe that the striking of this balance requires the Court to determine whether the tender offer is made in good faith and is realistic. In making these determinations, the Court is free to consider all of the facts and circumstances attendant upon the offer.

The SEC urges that the mere making of a tender offer in compliance with the Williams Act suffices to confer standing. The Commission states in footnote 8 on page 6 of its brief: "We are not addressing the situation, not presented here, where a person makes a sham tender offer, such as the offer made for J.J. Newberry & Co., described in SEC Litigation Release No. 3741 (June 2, 1967)."

Having received this brief from the SEC but a few hours ago, I have not had the opportunity to look into J.J. Newberry & Co. and to learn what it is that the SEC means when it refers to a "sham tender offer." Nor have I had the opportunity to determine whether there is any difference between what the SEC would call a "sham tender offer" and what the Court has referred to as one "which is not made in good faith, with a realistic prognosis for obtaining the requisite financing."

Assuming arguendo, contrary to the Commission's position, that the mere making of the tender offer in compliance with the Williams Act is not enough, the Court should and does here consider all the facts and circumstances in determining whether this is a good faith, realistic offer. Among other things, the Court may consider the past experience of the offeror, if there has been any. Here, this factor tilts decidedly in favor of the Plaintiff, whose principals have recently consummated the takeover of

Allied Stores, a major corporation engaged in the same business activities as Federated.

Further, the Court may consider the financial and other resources available to the offeror, and in that regard there has been filed with the Court today a copy of the release issued by the Plaintiff yesterday as to the funding that has become available to it. That release appears as Exhibit D to the Affidavit of Frederick A.O. Schwarz, Jr., Attorney for CRTF, dated February 11, 1988. It states: "Campeau Corporation announced today that it was renewing its offer to enter into a definitive agreement with Federated Department Stores, providing for Federated's stockholders to receive $61 in cash per share. In that connection, Campeau Corporation confirmed that it has arranged the required equity financing for the transaction." The release goes on to state the sources of that equity financing, which include a $400 million loan, and an agreement by another party to purchase $260 million of equity securities of Campeau Corporation. This of course provides far less than the over $5 billion required to consummate the tender offer, but it is certainly a substantial sum of money.

With respect to the availability of financial resources, the Court also considers the factors cited by the SEC in its memorandum, and the fact that Plaintiff has retained financial advisors and managers who are experienced in comparable transactions and who have access to appropriate funding sources.

The Court may also consider the extent of the investment made by the offeror in incurring the expenses attendant upon the offer, some of which have been noted by the SEC in its submission. These may include the cost of compliance with federal (and possibly state) statutes, regulations and filing fees, the cost of legal and financial advisors, and the cost of obtaining contingent financing.

We note that, although Federated has challenged standing based on the absence of financial commitment, it does not otherwise challenge the good faith of the offer. There is no suggestion in this case that the offer has been made or the expenses incurred to achieve any other purpose than the ultimate purchase of Federated, as set forth in the offer.

Based on all of these considerations, we are of the view that the Plaintiff has made a sufficient showing of standing to warrant our allowing the case to go forward to its next procedural stage. Hence, we deny the motion to dismiss for lack of standing, ripeness, and existence of a case or controversy based on the absence of financial commitments at this time, without prejudice to Federated's right to renew this claim if, at the time of the hearing on the merits of the application for a preliminary injunction, such renewal seems appropriate.

Further, we note that in determining on the merits the question of issuance of a preliminary injunction, if the Court is called upon to engage in a balancing of the equities for purposes of determining the appropriateness of issuing a preliminary injunction, the question of Plaintiff's ability to finance would of course again enter the equation.

For the reasons set forth above, Federated's motion to dismiss the complaint is denied.

## OPINION OF MARCH 18, 1988 (PRELIMINARY INJUNCTION)

We know from one of Judge Longobardi's opinions in *Black & Decker v. American Standard* that he was in the process of announcing an Opinion, when he was handed an envelope telling of another bid. So before we proceed any further, I suppose I should inquire whether there have been any developments during the course of the day of which I should be apprised.

Silence would indicate a negative.

We will deal with two of the many issues raised in the several motions pending before the Court. We recognize that there are issues with which we have not yet dealt but in view of the obvious need for prompt adjudication, we announce at this time our rulings with respect to: I) CRTF's motion for a preliminary injunction with respect to

the Federated "Poison Pill," and II) the expiration date of the CRTF tender offer.

## I. THE "POISON PILL"

On January 25, 1988, CRTF Corp. ("CRTF"), a New York subsidiary of Campeau Corp., commenced a cash tender offer for all shares of Federated Department Stores, Inc. ("Federated"). That same day, CRTF filed suit in the Southern District of New York, moving for a preliminary injunction against Federated and some of its officers and directors, claiming that the directors had breached their fiduciary duty in adopting a Rights Plan, dubbed by Plaintiff and sometimes referred to herein as a "Poison Pill", and in refusing to redeem the Rights in the face of Plaintiff's tender offer. Defendants promptly moved to dismiss, and that motion was denied on February 11.

Plaintiff's complaint also alleged violation of the federal securities law, and was once amended to add a challenge to the newly enacted Delaware takeover statute. Plaintiff has now dropped as moot its challenge to the Delaware statute, stating that the changed circumstances of the case make the statute inapplicable here.

Plaintiff claims that the Rights Plan is inherently invalid, but that even if the Court finds it valid on its face, it should find it invalid as applied. Plaintiff claims irreparable harm in that the existence of the Rights Plan is making it more difficult to get the firm financing that Federated urges is lacking in CRTF's proposal. CRTF further alleges irreparable harm in the dilution of shares it would possess, due to the effect of the Rights Plan, if its tender offer were to go through without the Board's approval.

CRTF claims that it will be illegally prevented from consummating its tender offer by the illegitimate actions of Federated's Board of Directors unless the Rights Plan is invalidated or the Board redeems the Rights with respect to CRTF's offer. The Federated Board has, at this point, agreed to redeem the Rights with respect to a competing offer from R.H. Macy & Co. ("Macy's"), with whom Federated has en-

tered into a contract, and Macy's has agreed that the Rights may be redeemed with respect to other offers as long as the company's shareholders have been provided with a full and fair opportunity to consider and act upon such other offers.

The parties are in agreement that an "auction" of the sort described in *Revlon, Inc. v. MacAndrews & Forbes Holdings*, 506 A.2d 173 (Del.1986) is now underway. CRTF charges that the continued existence of the Rights Plan in the midst of such an auction usurps to management the prerogative of deciding whether the Offer may be considered by the shareholders. Federated responds that the Plan is still necessary, both as a means of fending off coercive tender offers (and it claims that CRTF's offer is such a coercive offer), and as a tool for increasing the bidding (which it asserts is ongoing).

We must recognize the procedural context in which this matter is before the Court. This is a motion for a preliminary injunction. The standards for granting a preliminary injunction are well recognized. Plaintiff must show the existence of (a) irreparable harm and (b) either (1) a probability of success on the merits, or (2) both a fair ground for litigation and the balance of hardships tilting in its favor. *See Hanson Trust PLC v. M.L. SCM Acquisition, Inc.*, 781 F.2d 264, 273 (2d Cir.1986). It must be borne in mind that we are dealing in that procedural context and only in that procedural context.

For the purposes of this motion, we will assume the existence of irreparable harm to the Plaintiff.

### Chronology

Plaintiff's original tender offer was for $47.00 per share for all shares, and was conditioned upon several things, including:

1) approval of the offer by the Board of Directors;

2) the invalidation of the Rights Plan, or the redemption of the Rights by the Board;

3) the absence or inapplicability of valid legislation that would materially limit

its ability to consummate a second-step merger; and

4) CRTF's obtaining sufficient financing.

At the time of the initial offer, Plaintiff had no committed financing, and no letter from First Boston (CRTF's financial advisor/dealer manager) stating that the latter was "highly confident" that such financing could be arranged. The original offer was due to expire on February 22.

Federated immediately decried the offer as "grossly inadequate," and also questioned CRTF's ability to obtain financing. Following the initial tender offer, CRTF sought to convince the Federated Board to enter into a friendly merger, and raised its per share offer several times. Once the offer reached the mid-$60 range, Federated no longer appeared to consider the offer "grossly inadequate." However, Federated for some time spurned CRTF's advances on the grounds that CRTF had not made a sufficient showing of ability to finance the transaction.

Federated simultaneously sought alternative solutions, such as a possible restructuring plan, and competing bids for all or part of Federated. *See* Declaration of Howard W. Johnson, Director of Federated Department Stores, in Opposition to Motion, dated March 11, 1988, at 2–3; Federated Press Release, dated February 16, 1988, attached to Affidavit of Stuart L. Shapiro, Attorney for Federated, dated February 17, 1988, as Exhibit A. Federated said it would consider a CRTF offer if and when it was convinced that CRTF had sufficient financing. CRTF pointed out that it could more easily obtain financing commitments for a friendly merger than for an unfriendly takeover attempt.

On February 26, Federated and CRTF issued a joint press release stating that they were negotiating a merger at $68 per share, still for all shares. The parties asked the Court to refrain from ruling on the preliminary injunction at that time in view of the negotiations.

Over the weekend of February 27–28, the parties apparently came very close to a final agreement. On February 29, however, Federated issued a press release announcing that it would also consider another proposal "which appear[ed] competitive" with CRTF's offer. Federated Press Release, dated February 29, 1988, Plaintiff's Exhibit 77, at Tab 42. Later that day it made public the terms of this proposal. R.H. Macy & Co. had offered to make a two-tiered tender offer for approximately 80% of Federated shares at $73.80 per share, to be followed by a merger in which the remaining 20% of Federated shares would be exchanged for about 40% of a new Macy's/Federated entity.

Faced with this competing offer, CRTF representatives on March 1 entered into discussions with Federated as to the possibility of CRTF's raising its offer to $69.50 upon the satisfaction of certain conditions. No such offer, however, was ever finalized. That same day, both before and after the discussions with CRTF as to the possible $69.50 offer, the Federated Board received presentations from its financial advisors, including Goldman, Sachs & Co., Shearson Lehman Hutton, Inc., and Hellman & Friedman, as to the relative merits of the Macy's and the CRTF offers. During the course of the day, Macy's offer was raised to $74.50 for the first tier.

Goldman, Sachs advised the Board that the near-term trading values of the two offers were "roughly comparable," and that the blended value of the Macy's transaction would be in the neighborhood of $70 to $80, given certain assumptions. Declaration of Howard A. Silverstein, General Partner of Goldman, Sachs & Co., in Opposition to Motion, dated March 13, 1988, at 3–5.

Shearson Lehman opined that in the near term Macy's offer was roughly comparable to the CRTF offer, and that there was "a reasonable basis for concluding that Macy's offer presented a superior transaction for Federated stockholders because of the long-term values inherent in it." Declaration of James A. Stern, Managing Director of Shearson Lehman Hutton Inc., in Opposition to Motion, dated March 12, 1988, at 6.

Hellman & Friedman informed the Board that it believed "there was a reasonable basis on which the Federated Board could make a judgment that the offer presented by Macy's was superior to the offer presented by [CRTF], even assuming the [CRTF] offer would be increased to $69.50 per share." Affidavit of Tully M. Friedman, General Partner of Hellman & Friedman, in Opposition to the Motion, dated March 11, 1988.

The outside directors at the meeting separately and unanimously decided that Macy's offer was superior to CRTF's, and the Board as a whole unanimously agreed. Declaration of Reginald H. Jones, Outside Director of Federated Department Stores, in Opposition to Motion, dated March 11, 1988, at 6–7. Then, on March 2, Federated and Macy's jointly announced that a definitive agreement had been signed and approved by the Boards of Directors of both companies.

CRTF responded that same day with what has been characterized by Macy's and Federated as a "new" offer, and by CRTF itself as an "amended" offer. The distinction is relevant with respect to the number of days the offer must be kept open under SEC regulations, and we will deal with that aspect of the case in Part II of this Opinion. This was a two-tiered, all-cash offer for approximately 80% of the stock at $75, with the remaining 20% of the stock to be purchased at $44 at the time of the merger. The "blended value" of this offer is said to be $68 per share.

CRTF then set March 15 as the date of expiration of the offer, and on March 8 renewed its application for a preliminary injunction against the Federated Rights Plan. A hearing was set for March 14.

On March 14, Macy's amended its offer, raising the price to be paid in the first stage of the offer to $77.35, and lowering the percentage of Macy's/Federated stock that would be exchanged in the second stage to 36% from the original 40%. Affidavit of Howard Goldfeder, Chairman of the Board and C.E.O. of Federated Department Stores, in Opposition to Motion, dated March 14, 1988, at 3. Federated claims

that its investment bankers advised the Board that the new proposal is worth between $110 and $200 million more in the near term than Macy's original offer. Id. at 5.

When asked by the Court, at a hearing on March 14, whether CRTF had made its final offer, counsel for CRTF stated that it had indeed made the last offer that would be made in advance of the decision on the Poison Pill. Counsel did not, however, represent that CRTF had made its final offer in the bidding, even assuming no further bidding by Macy's. In fact, when the Court, in questioning Counsel about the expiration date of the offer, mentioned the possibility that Plaintiff could withdraw its offer, Counsel stated emphatically: "But we are not going to do that.... I am quite confident from having seen the determination of the businessmen and their advisors that they intend to press and press to get this company." Transcript, March 14, 1988, at 37.

While CRTF moves only for a preliminary injunction against the use of the Poison Pill itself, it also protests that Federated has granted certain advantages to Macy's as a "white knight" that it has unfairly denied CRTF as a hostile bidder. For example, it claims that Federated refused to provide CRTF with financial projections that it gave to Macy's. Federated replies that the sole reason CRTF was denied this information is that CRTF refused to sign a confidentiality agreement, while Macy's signed it. Goldfeder Affidavit, supra, at 7.

CRTF also complains that the Federated Board has agreed to severe restrictions on its ability to waive the "Poison Pill" with respect to competing offers. While Macy's had originally extracted greater restrictions on Federated's discretion to act under the Rights Plan, Macy's has now agreed that Federated may take any action under the Plan, including the redemption of Rights, if "in the judgment of the Board, the Company's shareholders have been provided with a full and fair opportunity to consider and act with respect to any com-

peting offer to acquire shares of the company." Goldfeder Affidavit, *supra*, at 4.

CRTF further protests that some provisions of the contract between Federated and Macy's are designed to deter competing bids. As of this time, Federated has agreed to provide Macy's with the following benefits if Macy's does not succeed in its battle to acquire Federated: 1) a "break-up" fee of up to $45 million for expenses incurred by Macy's with respect to this transaction; 2) a "topping" fee of 25% of consideration received in excess of $77.35 per share from another acquiror; and 3) a "lock up" of two divisions of Federated, which would be sold to Macy's at fair market value. Federated has also signed an agreement that CRTF describes as a "no shop" and that Federated describes as a "window shop" agreement. CRTF tells us that it is deferring action as to any of these agreements, which it describes as unlawful, at this time, preferring now to resolve only "the more pressing problem of the Poison Pill." CRTF does, however, ask that the Court require Federated to release PaineWebber from an agreement in which the latter had promised not to participate in the financing of a CRTF offer unless Federated agreed to such participation.

CRTF also alleges that actions by Federated's Board in this matter are tainted by certain aspects of the agreement with Macy's. Specifically, Federated is to be allowed to designated 40% of the Board of Directors of the new Macy's/Federated entity, and certain Federated insiders were to receive the blended value of their stock options in cash.

Federated's counsel represents, and the Court agrees, that it is normal in a merger for the merging corporations to designate members of the new Board of Directors proportionate to their interest in the new corporation. The new corporation will be owned 58% by former Macy's shareholders, 36% by former Federated shareholders, and 6% of the equity will be "reserved for issuance upon conversion of new convertible debt securities which Macy's [will] place privately in connection with financing

the tender offer." Goldfeder Affidavit, *supra*, at 3. We see no conflict of interest on the basis of the designation of the new Board.

As to the payment of cash for the options, Macy's and Federated have now agreed that the directors will receive for their deferred stock credits and their stock options "as near as practicable the same proportion of cash and stock of the combined entity as that being offered to Federated's public stockholders." Affidavit of Boris Auerbach, Vice President and Secretary of Federated Department Stores, in Opposition to Motion, dated March 16, 1988, at 6 and 7. Thus, we do not find that CRTF has a likelihood of success in showing divided loyalty on the part of the directors based upon this provision of the Macy's contract.

*Directors' Duties under Delaware Law*

Corporate directors have fiduciary duties of loyalty to the corporation, and of due care in the administration of corporate affairs. *See Revlon*, 506 A.2d at 179 (*citing Guth v. Loft, Inc.*, 23 Del.Ch. 255, 5 A.2d 503, 510 (1939). Under the business judgment rule, where a board of directors is found to have acted in good faith, a court will not try to substitute its judgment for that of the board, and will uphold the board's decisions as long as they are attributable "to any rational business purpose." *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del.1985) (citing *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del.1971)). Under Delaware law, the business judgment rule ("a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company") applies in the context of takeovers. *Id.* (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del.1984)). This is true despite the inherent potential conflict of interests that exists when a Board is in the position of deciding whether and how to defend against a takeover attempt.

To deal with this potential conflict, the Delaware Supreme Court has announced

an enhanced duty on the part of directors in this position. *Id.* at 955. The directors carry this burden by showing good faith and reasonable investigation, and that the defensive mechanism was reasonable in relation to the threat posed. *Id.*

To determine whether a Board of Directors has violated its fiduciary duty to its shareholders in enacting or taking actions under a challenged "Poison Pill" Rights Plan, a court must examine the motivations of the Board as it made its decisions, from the initiation of the plan through any actions taken under it (*Moran v. Household Int'l, Inc.*, 500 A.2d 1346, 1356 (Del.1985) (citing *Unocal*, 493 A.2d at 955)); it must consider whether the Board made an "informed" decision based on reasonable investigation, considered under a standard of gross negligence (*id.* (*citing Smith v. Van Gorkom*, 488 A.2d 858, 873 (Del.1985))), or perhaps of "reasonable diligence" (*see Hanson Trust PLC v. ML SCM Acquisition*, 781 F.2d 264, 274, 275 (interpreting New York law, and *citing Treadway Cos. Inc. v. Care Corp.*, 638 F.2d 357, 384 (2d Cir.1980), which interprets New Jersey law)); and it must evaluate the reasonableness of the Board's actions as a response to any given threats it perceives to the company (*Moran*, 500 A.2d at 1356).

The approval of any defensive measures by a Board composed of a majority of outside independent directors acting in good faith and upon reasonable investigation "materially enhance[s]" the proof that the Board has acted reasonably in response to the threat posed. *Moran*, 500 A.2d at 1356 (*quoting Unocal*, 493 A.2d at 955). If the directors succeed in making this showing, "the burden shifts back to the Plaintiffs, who have the ultimate burden of persuasion to show a breach of the directors' fiduciary duties." *Id.*

In an "auction" situation, "the directors' role remains an active one, changed only in the respect that they are charged with the duty of selling the company at the highest price attainable for the stockholders' benefit." *Revlon*, 506 A.2d at 184 n. 16. The directors' responsibility in carrying out their fiduciary duty becomes "the maximi-

zation of the company's value at a sale for the stockholders' benefit." *Id.* at 182.

### Development of The Rights Plan or So–Called "Poison Pill"

■ Federated Department Stores adopted a Rights Plan on January 23, 1986 (and amended it in 1987 and 1988 with respect to the percentages required to establish "triggering events" as described below). On that date the Board declared a dividend of one Right for each outstanding share of common stock. Initially, the Rights are transferrable only with the common stock and are not exercisable. However, upon the occurrence of any one of the following triggering events, separate Rights certificates would be issued on a "Distribution Date" that was the earlier of:

(i) 10 days after a person or group (the "Acquiring Person") either acquires 20% or more of Federated shares, or

(ii) 10 business days after an Acquiring Person commences a tender offer that would result in the Acquiring Person's owning 30% or more of Federated's shares, or

(iii) 10 business days after the Directors determine that a 15%-stockholder is an "Adverse Person" as defined in the Plan.

As of the Distribution Date, a holder of a Right could buy a share of Federated Preferred Stock at a very disadvantageous price (a disincentive to the shareholder's using the Right in that way). Once distributed, the Rights can be redeemed by the Board at a price of $.05 each. If the Rights are not redeemed by the Board, each Right would entitle its holder, except the Acquiring Person, to purchase common stock of Federated (the "flip-in" right) or of the Acquiring Person (the "flip-over" right) with a value equal to twice the exercise price of the Right (*e.g.*, $500 worth of stock for an exercise price of $250). The flip-in is also triggered if:

(i) Federated is the surviving corporation in a merger or other business combination with the Acquiring Person, or

(ii) the Acquiring Person engages in a self-dealing transaction, as defined in the Plan.

The flip-over is triggered if:

(i) Federated is not the surviving corporation in a merger or other business combination, or

(ii) 50% of Federated's earning power or assets are sold.

Affidavit of G. William Miller, Director of Federated Department Stores, Inc., in Opposition to Motion, February 16, 1988, at 3–8.

Under such a Plan, if the Board perceives a potential acquiror as posing a threat to the corporation, it can refrain from redeeming the Rights, resulting in the dilution of the shares owned by that party. Thus the Board can use its power to redeem Rights as leverage in dealing with a potential acquiror. In a tender offer situation, for example, the Board can seek improvements in price and financing arrangements, and can seek competing bids. As Plaintiff CRTF points out, however, the existence of such a Plan also creates the opportunity for management entrenchment.

As to the actions and motivations of the Board over the course of development of the Plan and in response to the CRTF tender offer and merger offers, as noted above, the Board has the burden of showing good faith and reasonable investigation. *Unocal*, 493 A.2d at 954.

According to G. William Miller, a director of Federated, the Board undertook to create the Plan not in the face of any specific takeover attempt, but because of concern "that the Company might be subjected to a number of coercive tactics which had become common in contests for corporate control." Miller Affidavit, *supra*, at 10. The Miller Affidavit further states that "the Board sought professional advice as to how to forestall such coercive tactics without preventing offers the Board might consider favorable." *Id.* at 12–13. Where a defensive mechanism was adopted to ward off possible future advances rather than in reaction to a specific threat, the Delaware Court has found that "in reviewing a pre-

planned defensive mechanism it seems even more appropriate to apply the business judgment rule." *Moran*, 500 A.2d at 1350. We think that, in a final decision on the merits, a court would likely apply the business judgment rule in considering the validity of the Plan as originally adopted.

The Plan was amended twice, the first time apparently again merely as a pre-planned defense mechanism, and the second time in response to a specific perceived threat. *See* Miller Affidavit, *supra*, at 16–18. The most significant aspect of the first amendment, adopted September 18, 1987, was that it lowered the "flip-in trigger" from 50% to 30%. This was done "in recognition that effective control of a corporation could pass as a result of a 30 percent or more stock acquisition." *Id.* at 18. Mr. Miller asserts that the second amendment, adopted on January 21, 1988, was a response to Donald J. Trump's announcement of his intention to acquire 15% or more of Federated. Mr. Miller states:

"There was concern expressed that Mr. Trump might attempt to extract green-mail from Federated or that he might seek to use a position in Federated stock, or the threat of an accumulation of stock, to aid his real estate negotiations [ongoing with Federated]. There was also a concern that Federated stock price had become under-valued in the wake of the October 19, 1987 stock market crash."

*Id.* This later amendment provided that the triggering amount would be reduced to 15% from 30% if, but only if, the Acquiring Person were determined to be an "Adverse Person," defined in the amendment as posing certain specific types of potential harm to the corporation. *Id.* at 18–19.

Plaintiff alleges that the directors breached their fiduciary duty to their shareholders in taking these defensive measures. Plaintiff's expert witness suggests that the original Plan was adopted "in apparent response to reports in the financial press of an impending takeover attempt," but alleges no personal knowledge. Affidavit of John C. Coffee, Jr., Professor of Law at Columbia University, in Support of Motion, dated February 16,

1988, at ¶ 7. Plaintiff charges that Mr. Miller's allegations about Mr. Trump's interest are suspect because, in a press release issued at the time of the amendment Federated stated that it "wasn't aware of any accumulation of its stock, but was taking action 'to discourage any such activity.'" Associated Press Release dated January 22, 1988, Plaintiff's Exhibit at Tab 4. At oral argument, Plaintiff suggested with respect to Federated's January 21, 1988 press release, which Plaintiff claims was false and misleading, that Federated may well have been expecting CRTF's tender offer. Transcript, January 28, 1988, at 30–31.

Despite CRTF's allegations,[2] we do not find that CRTF has a likelihood of success on this issue. That is, we do not believe CRTF will succeed in showing a breach of duty in the adoption of the Plan or the amendments, which appear to have been reasonable in response to the threats we believe were posed to the corporation at the time they were adopted.

It is the opinion of the Court that Plaintiff will be unable to establish that the Federated Plan is, in and of itself, invalid. The "Poison Pill" includes no price barrier to discourage offers below a perhaps artificially high trigger price as was the case in *Dynamics Corp. of America v. CTS Corp.*, 805 F.2d 705 (7th Cir.1986), and in *Buckhorn Inc. v. Ropak Corp.*, 656 F.Supp. 209 (S.D.Ohio), *aff'd mem.*, 815 F.2d 76 (6th Cir.1987). It provides the directors with a shield to fend off coercive offers, and with a gavel to run an auction. As the facts have shown, it is not a "show stopper." In fact it was clearly a factor in the Board's ability to obtain improvements in the price and financing arrangements offered by CRTF even before the advent of the Macy's offer, as discussed below, and to seek competitive bids from third parties, and to obtain the Macy's bid. *Cf. Revlon*, 506 A.2d at 181 ("[T]he Plan was a factor in causing Pantry Pride to raise its bids from a low of $42 to an eventual high of $58.").

As the Delaware Supreme Court found in upholding a "flip-over" rights plan:

> "The Rights Plan is not absolute. When the [Board] is faced with a tender offer and a request to redeem the rights, they will not be able to arbitrarily reject the offer. They will be held to the same fiduciary standards any other board of directors would be held to in deciding to adopt a defensive mechanism."

*Moran*, 500 A.2d at 1354.

### Redemption of the Rights

CRTF claims that, even if the pill is not invalid on its face, it is a breach of fiduciary duty for the Board to refrain from redeeming the Rights and dropping all other defensive measures once a *Revlon*-type auction is underway. CRTF also asserts that certain of the favorable conditions granted to Macy's in the agreement between Federated and Macy's are impermissible in that they favor one bidder over another in an auction situation.

CRTF cites language from *Revlon* that it interprets as requiring a target Board to drop all defensive measures, including Poison Pills, when bidders make relatively similar offers, or when dissolution of the company becomes inevitable. *Revlon*, 506 A.2d at 184 ("Favoritism for a white knight to the total exclusion of a hostile bidder might be justifiable when the latter's offer adversely affects shareholder interest, but when bidders make relatively similar offers, or dissolution of the company becomes inevitable, the directors cannot fulfill their enhanced *Unocal* duties by playing favorites with the contending factions."). Plaintiff asserts that the existence of either condition would suffice to require the dismantling of the pill, and that in fact both conditions are present here. In Plaintiff's preferred scenario, the shareholders should simply be given the offer and any information the Board may wish to provide as to the value of the company and as to its view of competing offers, and allowed to decide for themselves whether they wish to sell at the price offered.

---

**2.** CRTF initially sought expedited discovery but later abandoned this request, doubtless because of the time constraints created by its self-imposed tender offer expiration date.

Federated replies that the *raison d'etre* of its Rights Plan is to protect shareholders against just such coercive tactics as CRTF is engaged in here. Federated also points to several possible results that might follow upon its redemption of rights other than in the context of a binding deal. The first is that CRTF could drop its offer and "sweep the street"[3] to acquire a controlling block of Federated stock, without having taken on any obligations to existing Federated shareholders (as Federated alleges Campeau, CRTF's parent company, did in its takeover of Allied Stores Corp. in 1986). Also, if Federated were to redeem the Rights other than as an element of a binding deal, third parties could seek to defeat the more beneficial proposal through a street sweep or a front-end loaded offer.

CRTF claims that its two-tiered offer is not intended to be coercive, but was required in order to make the CRTF offer as comparable as possible to the Macy's offer. It asserts that the danger was that investors would tender into a $74.50 offer for 80% of the shares rather than into a $68 offer for 100% of the shares, even if the latter was a more beneficial offer overall.

While there might have been some substance to this explanation if the offers were due to expire on the same date, the fact that CRTF's offer was due to expire well before Macy's offer renders this explanation rather unpersuasive. It is the opinion of the Court that, regardless of the motivation, the principal consequence of the change to a two-tiered, front-end loaded, all cash offer is to coerce shareholders to tender into the first stage offer at $75 to avoid being left with shares worth only $44 in the subsequent merger.

It is clear that under Delaware law a Board of Directors need not be a passive observer. According to the Delaware Court, concerns that may give rise to reasonable defensive responses include "inadequacy of the price offered, nature and timing of the offer, questions of illegality, the

impact on 'constituencies' other than shareholders . . ., the risk of nonconsummation, and the quality of securities being offered in the exchange." *Unocal*, 493 A.2d at 955. A Board clearly has the right to use its powers to defeat a coercive, two-tiered, front-end loaded bid with a timing advantage, where the Board believes the offer would not be in the interests of the shareholders.

We are taking into consideration the fact that at all relevant times, from the development of the Plan through the present, the Federated Board of Directors has consisted of a majority of outside directors. *See* Miller Affidavit, *supra*, at 14 and 17. As noted above, this materially enhances the proof that the Board was acting in good faith.

Thus far the Court has seen no evidence sufficient to warrant the granting of preliminary injunctive relief that the Board of Federated has acted other than in the best interests of the shareholders here. The directors have solicited competing bids, and have obtained one that they consider more advantageous than the CRTF offer currently on the table. They have stated that they are willing to consider improved offers from CRTF, and offers from still other third parties, and their contract with Macy's does not at this point in any way preclude this. Even Plaintiff's expert witness concedes that a Board's refusal to redeem a "flip-in" rights plan is considered a reasonable response under *Revlon* where it is "designed to promote a value-maximizing auction" and where the Board "actively [seeks] to elicit a higher bid." Coffee Affidavit, *supra*, at ¶ 13.

With respect to the benefits bestowed upon Macy's, we note that lock-ups, break-up fees, and window-shop provisions are not illegal where they enhance rather than stop the bidding. Such devices "may be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking." *Samjens Part-*

---

**3.** A "sweep of the street" is the acquisition of large quantities of stock at reduced prices immediately after termination of a tender offer primarily from arbitragers who acquired stock in anticipation of the offering being consummated.

ners I v. Burlington Industries, Inc., 663 F.Supp. 614, 624 (S.D.N.Y.1987). *See also Yanow v. Scientific Leasing* (Del. Chancery Court, February 8, 1988) (option to purchase shares, expense reimbursement, window shop, and management incentive and compensation agreements upheld). However, we note that such devices must be scrutinized very carefully by a court called upon to evaluate them. *See Revlon,* 506 A.2d at 183–84; *Black & Decker Corp. v. American Standard, Inc.,* slip op. # 88–50 LON (D.Del., March 16, 1988).

We remind counsel for Federated that decisions such as whether or not to release PaineWebber from its agreement, and to allow it to participate in CRTF's financing, will also be scrutinized by the Court in its ultimate review of the Board's actions in conducting the auction. [Epilogue: After the issuance of this Opinion, Federated released PaineWebber and another funding source from prior contractual restrictions on their ability to enter into financing agreements with CRTF.]

■ As noted above, CRTF claims that *Revlon* requires that once an auction has been set in motion, the target corporation must drop all its defenses and allow market forces to take over. We believe, rather, that with respect to a poison pill, the teachings of *Revlon* require directors to enhance the bidding in an auction as best they can.

The Delaware Court was troubled in the *Revlon* case by its finding that "the directors allowed considerations other than the maximization of shareholder profit to affect their judgment." *Revlon,* 506 A.2d at 185. It is true that some of the Court's language in *Revlon* suggests that defensive measures do become even more suspect than is normally the case once the offers are relatively similar or the break-up of the company has become inevitable. Nevertheless, the gist of the opinion, echoed throughout, is that directors must "sell[ ] the company at the highest price attainable for the stockholders' benefit." *Id.* at 184 n. 16. Thus we believe that language such as "[m]arket forces must be allowed to operate freely to bring the target's shareholders the best price available

for their equity" (*id.* at 184) must be read to emphasize the goal of the "best price available" rather than the means of "market forces."

The *Revlon* court was dealing with a situation in which it had found:

"[T]he Revlon board ended the auction in return for very little actual improvement in the final bid. The principal benefit went to the directors, who avoided personal liability to a class of creditors [noteholders] to whom the board owed no further duty under the circumstances. Thus, when a board ends an intense bidding contest on an insubstantial basis, and where a significant by-product of that action is to protect the directors against a perceived threat of personal liability for consequences stemming from the adoption of previous defense measures, the action cannot withstand the enhanced scrutiny which *Unocal* requires of director conduct."

*Id.* (*citing Unocal,* 493 A.2d at 954–55).

We see nothing at this point that suggests that the Federated Board is acting with any other motive than to enhance the bidding and to raise the price for the benefit of the shareholders. Thus, we do not find that Plaintiff has, at this stage of the record, demonstrated a likelihood of success on the issue of the invalidity of the pill as applied in this situation, that is, on the continued invocation by the Federated Board of the Rights Plan vis-a-vis CRTF's present two-tiered bid.

We agree with and find persuasive the claim of Federated's Board that the auction is still in progress. The situation appears to be highly fluid, with daily press accounts of revised offers from each of the bidders. Judicial intervention at this time would therefore be unwarranted and counter-productive.

This Court need not and does not now decide what the legal rights and liabilities of the parties will be if and when the Board invokes the Rights Plan against a bidder who declares unequivocally that it has made its final offer (in the absence of a still higher, later, competing bid) but the Board waives the Plan with respect to another

allegedly lower bidder. We recognize that, if a Court were to require an absolute and unequivocal final offer, the moving party's adversary could then attempt to top that offer and thus be virtually assured of making the final bid of the auction. Hence we do not envision that the Court would hold the first party to its "final offer" in such a situation, but rather that it would recognize that the auction is still in progress, and would deny the application for relief without prejudice to renewal when the auction ends.

If the issue of selective invocation of the Rights at the end of the auction arises, the Court will be required to scrutinize carefully the actions of the Federated Board and any claims that the decision to favor a particular bidder was improperly influenced by any considerations—such as conflicts or insider preferences. We wish to be clearly understood that we are not now reaching these questions. We simply decline to overrule the Board's determination that the auction is still in progress, especially in the absence of a representation by CRTF both that it believes its bid is the higher, and that, in the absence of a still higher, later, competing bid, it has made its highest and final bid. Thus, our sole holding is that at this time and on this record CRTF has not shown a likelihood of success on its claim that it is entitled to a preliminary injunction against the Federated Board's continued invocation of the Rights Plan with respect to CRTF's present two-tiered bid.

### Balance of Hardships

Because we do not find that CRTF has shown a likelihood of success on the merits, but we do consider that it has shown fair grounds for litigation, we will consider the balance of hardships.

It is clear that CRTF can make, and has made, its offer conditional upon the invalidation of the Poison Pill or the redemption of the Rights. If Federated should refuse to redeem the Rights, making itself unpalatable to CRTF, CRTF can simply back away from its offer. It will have lost financing fees, SEC filing fees, and attorneys' fees. If we were to enjoin Federated from the exercise of the Rights Plan, we would be making it vulnerable to a street sweep; to this and other coercive, two-tiered, front-end loaded tender offers; to a decrease in existing offers; and possibly to other dangers. Even without entering into such fearsome perils, we might be subjecting Federated to a transaction that it deems inadequate because of the lack of completely committed financing, and its hesitation before that inadequacy might prove to be well founded. Moreover, and most important, we would be stopping the auction sale now in progress.

Thus we find that the balance of hardships tilts in the direction of Federated.

### Conclusion

"When ... battles for corporate dominance spawn legal controversies, the judicial role is neither to displace the judgment of the participants nor to predetermine the outcome. Rather, the responsibility of the Court is to insure that rules designed to safeguard the fairness of the takeover process be enforced." *Norlin Corp. v. Rooney, Pace Inc.*, 744 F.2d 255, 258 (2d Cir. 1984).

We have found that the Plaintiff does not have a likelihood of succeeding in its claim that Federated's Board has not acted in good faith after reasonable investigation. We believe that the Federated Board has reason to believe that a danger to the corporation and its shareholders exists, and we believe that the use of the Poison Pill to thwart that danger is a reasonable response. On this state of the record, Federated's refusal to waive the Rights Plan in the belief that the auction is continuing also seems reasonable. CRTF's representatives have already proposed the possibility of a $69.50 offer, CRTF has stated that it would add $2.20 per share to the back end of its current offer if the "break-up" fee were to be invalidated, and CRTF is described by its counsel as being determined to buy Federated. Accounts in the press indicate that Macy's is considering modifications of the terms of its offer.

We believe that we would be more likely to disrupt the auction at this point by dismantling the Pill than by upholding it. We will know that the auction has ended when a bidder represents to the Court unequivocally that it has made its final offer, with the reservation described above. What the posture would be here if no improved offer were to arise, either from CRTF or from some third party, and if the Federated Board were to continue to invoke the Rights Plan, is something we need not and do not decide at this time.

In conclusion, we hold that Defendant Federated's Board of Directors receives the benefit of the business judgment rule in its adoption of the Rights Plan, and in the actions thus far taken under that Plan. The motion for a preliminary injunction is denied without prejudice to renewal.

## II. THE EXPIRATION DATE

Two issues are presented with respect to the expiration date of the CRTF offer. With respect to each of these issues we have sought guidance from the Securities and Exchange Commission.

 The first relates to the claim by Federated and Macy's that the revision of the CRTF offer from a single-tier, all-cash offer to a two-tiered all-cash offer constituted a new offer which, under SEC regulations under the Williams Act, could not expire until twenty business days after its promulgation. CRTF asserted that the offer was an amended, not a new offer and therefore expired ten business days after promulgation.

In an amicus curiae submission of March 16, the SEC opined that the CRTF offer was an "amended offer" and that the ten-day rule applied.

The SEC reasoned:

"The March 2 changes in the CRTF tender offer are important changes, which constitute an amendment to CRTF's offer requiring an extension of ten business days, but do not constitute a new offer. The two changes made in the CRTF offer on March 2 were in the percentage of stock being sought and the price to be paid for the stock. Both of these items are covered by Rule 14e–1(b), and are, pursuant to that rule, changes which only require that the offer remain open for ten business days. The twenty business day period for new offers provided by Rule 14e–1(a) allows for evaluation of far more than price and quantity. Although price and quantity are highly significant to a security holder's investment decision, a tender offeror also discloses the form of consideration, the procedures for tendering shares, information on financing, its purpose in making the offer, its plans for the target company and other information. *See* Schedule 14D–1, 17 C.F.R. 14d–100. The twenty-day requirement applicable to new tender offers contemplates that *all* of this information must be evaluated by shareholders. On the facts presented here, the changes do not, in themselves, constitute a new offer.

The fact that the rule is phrased in the disjunctive—that is, requires that the offer remain open for ten days if either price or percentage is changed—does not mean, as Macy contends, that it is inapplicable if both price and percentage are changed. Indeed, changes in the price being offered and the percentage of stock being sought will often be linked, since the blended price being paid to investors may change as the percentage of stock being sought changes. In this case, for example, had CRTF not changed its price, but only lowered the percentage of stock being sought, investors might be confronted with the prospect of a blended price change. The net effect of the price changes made by CRTF, increasing the consideration in the tender offer to $75 per share while lowering the consideration to be paid in the second-step merger transaction to $44 per share, is to keep the *blended* value of the offer approximately the same as the price prior to the March 2 changes. The argument that investors would only need ten business days to consider a percentage change which might effectively change the offering price, but twenty days to consider a percentage change

and a compensating price change, is not persuasive. The Commission believes that the ten days provided by the rule is sufficient to enable investors to evaluate changes in both price and percentage of stock being sought." (Footnotes omitted.)

We accept this reasoning, not merely in deference to the expertise of that specialized and knowledgeable Agency, but because its reasoning appears sound. Accordingly, we deny so much of the Defendant's motion as was predicated on its claim that CRTF's offer was a new rather than amended offer.

The second issue with respect to the expiration date of the CRTF offer is more troublesome. At the proceedings held on Monday, March 14, the question was raised whether CRTF had sufficiently disclosed definitive details of its financing or whether it would be required to file a further statement with respect to financing, with the consequence that the offer would have to be extended until five days after such filing. If the latter is the case, then of course the CRTF offer must be held open until five days after an event which has not yet occurred.

We were advised by counsel for CRTF on March 15 that the staff of the SEC had tentatively determined that a further filing as to financing would be required. The SEC, whose views we have sought on the question, will make those views known to the Court early next week.

In this state of affairs and to avoid confusion we determine that the CRTF offer must remain in effect until the close of business on Friday, March 25, 1988, or such later date as the Court shall determine. The Macy's offer, of course, by its terms remains in effect until April 4.

[Epilogue: On March 28, in a letter filed with the Court, the SEC opined that "when CRTF has obtained commitments for all or substantially all of the remaining financing needed to complete its offer, that will be a material change in its offer which will have to be disclosed. Shareholders will have to be provided a minimum of five business days to consider that change." The SEC cited Schedule 14D-1, 17 C.F.R. 240.14d-100 and Rule 14d-3, 17 C.F.R. 240.14d-3, which require a tender offeror to provide with respect to borrowed funds,

"a summary of each loan agreement or arrangement containing the identity of the parties, the term, the collateral, the stated and effective interest rates, and other material terms or conditions relative to such loan agreement."

The letter is on file as Court Exhibit I of March 29, 1988.]

SO ORDERED.